# THE STATE ex rel. HAWES et al. v. MASON.

### In Banc, December 19, 1899.

153   23
152   666

153   23
154   512

153   23
f155   502
f155   505

153   23
86a   579

153   23
96a   4163

153   23
178   9220

1. **Police Commissioners in St. Louis:** ACT OF 1899. The Act of March 15, 1899 (Laws 1899, p. 51), repealing the law of 1861, and "providing for the creation and organization in all cities having 300,000 inhabitants and over, of a board of police commissioners, and authorizing the appointment and providing for the government of a police force for such cities," is constitutional.

2. **Police Regulations:** INHERE IN THE STATE. Laws providing a police system for large cities are based upon the elementary principle of civil government that the protection of life, liberty and property and the preservation of peace and order are a governmental duty which devolves upon the State in its sovereign capacity and not upon the municipalities any further than the State in its sovereignty may see fit to impose upon or delegate it to the cities. And from this inherent attribute of government flows the corresponding power of the State to impose upon municipalities of its own creation a police force of its own creation, and to compel its support out of the municipality's funds.

3. **Municipal Office:** CONTROLLED BY STATE. Wherever the Legislature has the right to assume control of a municipal office, it has likewise the right to compel the city to provide for defraying the expenses of such office.

4. ———: ———: POLICE: STATE OFFICERS. Police boards and metropolitan police forces are State officers.

5. ———: NUMBER OF OFFICERS: REGULATED BY BOARD. An Act of the Legislature giving a board of police commissioners power to appoint "a permanent police force," which says that the number "shall not be less than 850 patrolmen and 250 probationary patrolmen, 25 detectives, and 35 turnkeys," and that "such number may be increased to such additional force as extraordinary emergencies may require," does not give the board power to increase the number of permanent policemen above these numbers, but limits their power to increase the force at all to extraordinary emergencies, such as riots. Hence, such a law is not a delegation by the Legislature of a legislative duty to an administrative body; that is, it is not open to the objection that it was an incomplete law when it left the legislative body and to become operative must be supplemented by the board of police commissioners.

State ex rel. v. Mason.

6. ———: ———: ARBITRARY AND UNREASONABLE NUMBER. The establishment by the Legislature of a police force of 1100 or 1200 men in a city of 750,000 inhabitants, and requiring that they be maintained out of the city taxes, is not an unreasonable and arbitrary regulation.

7. Construing Statutory Language: SUSCEPTIBLE OF TWO MEANINGS. Where statute is susceptible of two readings, one of which is in harmony with the Constitution and the other not, the courts will not declare it void, but will give effect to that one which harmonizes with the Constitution.

8. Police: CONTROLLED BY STATE: OBLIGATIONS OF CITY TO SUPPORT: TAX LEVY. The State has authority to create a police force for a city and compel the city to maintain it. The State in such case, by the very act creating the force and prescribing their pay and directing the city to pay it, levies the tax, and directs its agent (the city) how to apply it. The city does not levy it, and can not say she has assumed obligations which are superior to charges imposed upon her revenue by the State. The Legislature has the power to require that the municipal authorities shall pay for the maintenance of the police force out of the city revenue, in preference to other appropriations thereof by the municipal assembly which such assembly may deem an equally necessary department of government.

*Held,* by MARSHALL, J., that there is no question of taxation involved in this case, but that the State has the power to require the city of St. Louis to pay the expenses of the police department out of any money it may have from whatever source derived.

9. ———: ———: ———: CONSTITUTION: MUNICIPAL PURPOSE. Nor is this holding in conflict with section 10 of article X of the Constitution, which prohibits the Legislature from imposing taxes on counties, cities and towns for county, city or other municipal purpose. The preservation of the peace and the protection and life and property is a State and not a municipal function.

10. ———: ———: ———: ———: SPECIAL LAW. St. Louis is not in either of the four designated classes of cities defined by the Constitution, but is organized specifically by name by the Constitution itself, and a general law intended for her government in a matter relating to the State government need not refer to her as a "city having three hundred thousand inhabitants or over," but may designate her by name. And such law would not be special or class legislation.

11. ———: ———: ———: FUNDS DERIVED NOT BY TAXATION: FEDERAL LAW. Nor is such law in violation of the Fourteenth Amendment to the Constitution of the United States on the ground that the city derives money from carrying on certain enterprises in its

State ex rel. v. Mason.

private corporate capacity, and this law seeks to subject to the mainte-nance of the police force "any moneys" in the city treasury. That amendment is not involved, because the law appropriates for such purpose only "the revenues of said city," which does not include any funds impressed with a trust.

12. **Mandamus:** AUDITING ACCOUNTS.    When a claim has been al-lowed by the board or officer charged by law with the duty of passing on its validity or amount, it then becomes the duty of the auditor to audit the same and draw his warrant on the disbursing officer.

13. ———: APPROPRIATIONS.    The Supreme Court will compel by mandamus the city auditor of St. Louis to draw his warrant for the pay-ment, out of any general revenue in the city treasury, of the police force established in pursuance to an act of the Legislature, without waiting for the Municipal Assembly to make a special appropriation therefor. The law itself makes all the appropriations necessary for its enforce-ment.    It is intolerable that the State's authority and the enforce-ment of one of its laws should depend upon the caprice or judgment of the legislative council of a municipal corporation which the State has created.

   *Held*, by· MARSHALL, J., in separate opinion, that the Act of 1899 did not make and was not intended to make an appropriation, *ipso facto*, to meet the requirements of the Act, and that the auditor could not be compelled to audit a claim until there was a specific appropriation to meet it.    *Held*, also, that so much of the appropria-tion made by the municipal assembly for the support of the police force for the current fiscal year as remained unexpended at the time the salary-roll was certified, was such a specific appropriation as authorized the auditor to draw his warrant.

14. ———: ———: BY THE ACT ITSELF.    Where the Constitution or an act of the Legislature creates an office, and fixes the salary and the time of its payment, and authorizes and directs the auditor to draw his warrant to pay the same, the constitution in the one case and the legislature in the other thereby makes the appropriation, and no further appropriation is necessary to authorize the auditor to draw his warrant for its payment.    And tested by this rule, it is held that under the Act of the Legislature of 1899, it is the plain legal duty of the city auditor to draw his warrants for the pay-rolls and expenses certified to him by the police board of St. Louis, for the payment of the police officers of that city, whether the Municipal Assembly has made an appropriation therefor or not.

15. ———: ———: APPROPRIATION APPLICABLE TO THIS STATUTE.    The police law of 1899 for St. Louis went into effect August 20th. On August 7th, the Municipal Assembly appropriated $962,340 for the expenses for the year ending March 31, 1900, of a "metropolitan

police department and force," which at the time was composed of about three-fourths as many men as were provided for by the new act. On September 1st, the police board, having reorganized the force under the new law, certified its salary rolls to the auditor, which he refused to pay. *Held*, that the Municipal Assembly, in legal intendment appropriated this money for such police department as the State saw fit to impose on the city, and the city auditor was not justified in refusing to issue his warrant, against the unexpended portion of the $962,340, for the salary-roll, on the ground that no appropriation for its payment had been made.

16. ———: PARTIES. The city of St. Louis is not a necessary party to a proceeding by mandamus to compel the city auditor to draw his warrant for the salary-roll of the police force.

17. **St. Louis Police:** ACT OF 1899: AMENDMENT OF ACT OF 1860-61. The St. Louis police Act of 1899 is an amendment of the act of 1860-61, although it purports to repeal the latter.

18. ———: ———: NOTICE. The Municipal Assembly is bound to take notice of the passage of an Act of the Legislature concerning her government in a matter relating to the State government,

## *Mandamus.*

PEREMPTORY WRIT AWARDED.

*F. N. Judson, John H. Overall* and *R. H. Kern* for relators.

(1) The Act of March 15, 1899, is constitutional. First. It is established law that the State has the power to impose a police force upon its municipalities, and compel their support out of the municipal revenues derived from taxation. 1 Dillon on Mun. Corp. (4 Ed.), secs. 58 and 61; Tiedeman on Mun. Corp., sec. 18; Cooley on Taxation, p. 481; State ex rel. v. County Court of St. Louis County, 34 Mo. 546; Mayor of Baltimore v. State ex rel., 15 Md. 376; People v. Draper, 15 N. Y. 532; People v. Mahaney, 13 Mich. 481; State ex rel. v. Hunter, 38 Kan. 578; Police Commissioners v. Louisville, 2 Bush (Ky.) 797; Diamond v. Cain, 21 La. Ann. 309. Second. The State can make this power effective by applying the municipal revenues directly to the sup-

port of the police establishment, this being done in the exercise of its sovereign control over the revenues of its cities and counties. 1 Dillon on Mun. Corp. (1 Ed.), sec. 62; Comm. v. County Court, 34 Mo. 546; State ex rel. v. Field, 119 Mo. 614; State v. Owsley, 122 Mo. 68; State ex rel. v. Pike County, 144 Mo. 275. (2) The contention of respondent that the Act involves an unconstitutional delegation of legislative power, is unfounded. First. This contention is based upon the alleged power to increase the force contained in section 6, which is construed by counsel to give the board the power to increase the permanent police force *ad libitum*. But even if this construction is correct, there is no attempt in this case to exercise such power, and it will be time enough to determine whether the Act assumes to give such power when the board assumes to exercise it. People v. Mahaney, 13 Mich. 481. The power to increase is clearly separable from the power to appoint the force in the Act. The invalidity of the power to increase can not possibly affect the validity of the power to appoint. People v. Mahaney, 13 Mich. 481; Tarkio v. Cook, 120 Mo. 1; Grimes v. Eddy, 126 Mo. 168; State v. Bockstruck, 136 Mo. 335. Second. The construction upon which the contention is based is erroneous. The Act properly construed does not authorize the commissioners to increase the permanent police force *ad libitum*, and only differs from the Act of 1861 in that it contains a definite requirement not only as to the salaries but number of the force, leaving the city free to increase the force above the minimum, the only increase which the board is authorized to make without the city's consent being the temporary increase for extraordinary emergencies, as in the Act of 1861. Third. But even if there was any doubt as to the proper construction of the Act, and conceding for the argument the contention of counsel, that the effect of their construction would invalidate the Act, the court is bound to give the Act a construction in case of doubt which would make it constitutional. Black on Interp. of

Laws, pp. 93 and 94; Parsons v. Bedford, 3 Peters 433. Fourth. But counsel's contention as to the effect of their construction is also erroneous. Even if the Act is construed as conferring upon the board of police commissioners the power to increase the permanent force, such power to increase would not be an unlawful delegation of legislative power, but would be the delegation of a mere administrative or executive function. 6 Am. and Eng. Ency. of Law (2 Ed.), p. 1029; Locke's Appeal, 72 Pa. St. 498; Railroad v. Comm., 1 Ohio St. 88; Field v. Clark, 143 U. S. 694. It may or may not be unwise legislation to omit providing the maximum increase, but the question involved is not of the wisdom of the legislation, but the power. Pueblo Co. v. Smith, 22 Colo. 534; Morris v. People, 8 Colo. App. 379; Ex parte Bassit, 90 Va. 679; Nelson v. Troy, 11 Wash. 435; State v. Bicker, 3 So. Dak. 29; In re Gilson, 34 Kan. 641; Winston v. Stone, 43 S. W. Rep. 338; Johnson v. Martin, 75 Kan. 33; State v. Higgins, 125 Mo. 364; Newark v. Lyon, 53 N. J. L. 632. (3) The Act of March 15, 1899, is violative of no provision of the constitution. It is not violative of section 10 of article X. There is no tax in this case imposed upon municipal corporations for municipal purposes. 1 Dillon on Mun. Corp. (4 Ed.), sec. 141; Ewing v. Hoblitzelle, 85 Mo. 64; State ex rel. v. Field, 119 Mo. 614; State v. Owsley, 122 Mo. 68; State v. Board of Education, 141 Mo. 49. (4) Nor is the Act violative of sections 53 and 54 of article IV of the Constitution. This objection also applied to the law of 1861, and that Act was recognized and adopted in the charter of St. Louis, adopted under the Constitution of 1875. State v. Miller, 104 Mo. 339; State v. Bell, 119 Mo. 470; State v. Arnold, 136 Mo. 446; State ex rel. v. Miller, 104 Mo. 339; Dunn v. Railroad, 131 Mo. 4; State v. Shields, 4 Mo. App. 59. It has been repeatedly held by this court that legislation in pursuance of the constitutional direction can not be local or special in any sense. State ex rel. v. Tolley, 121 Mo. 645; State ex

rel. v. Yancey, 123 Mo. 391; Spalding v. Brady, 128 Mo. 653; State ex rel. v. Higgins, 125 Mo. 364; Kansas City v. Stegmiller, 52 S. W. Rep. 723.    (5)    The Act is not violative of section 1 of the Fourteenth Amendment of the Constitution of the United States.    It does not deprive the city of property without due process of law.    Dillon on Mun. Corp. (4 Ed.), sec. 61; State ex rel. v. St. Louis County Court, 34 Mo. 546.    (6)    The writ of mandamus was properly issued from this court against respondent to compel the payment of the pay roll in question.    (a)    General principles governing issuance of the writ.    State v. Francis, 95 Mo. 57; Mansfield v. Fuller, 50 Mo. 339; State v. Howard Co., 39 Mo. 375; State v. Bordelon, 4 Cal. 177; McCauley v. Brooks, 16 Cal. 47; High on Extra. Legal Rem., secs. 324 and 325; Dillon on Mun. Corp., sec. 831.    (b)    The Constitution vests original jurisdiction in this court to issue writs of mandamus. State v. Walbridge, 123 Mo. 524; State v. Philips, 97 Mo. 331; State v. Tracy, 94 Mo. 220; State v. Treasurer of Callaway Co., 43 Mo. 228; State ex rel. v. St. Louis Court of Appeals, 99 Mo. 221.    (c)    Under the Act in question there is a clear ministerial duty imposed upon respondent to audit and pay the claims and salary-rolls certified by the police board. Mansfield v. Fuller, 50 Mo. 338; State v. Oliver, 116 Mo. 194; Merrill on Mandamus, secs. 126, 104 and 105; High on Extra. Legal Rem., sec. 351; State v. Kennedy, 10 Mont. 488; People v. Flagg, 16 Barb. 503; State v. Mount, 21 La. Ann. 352; State v. Buffalo Co., 6 Neb. 454.    (7)    The Act of itself makes an appropriation, as in the original Act of 1861, and no appropriation by the municipal assembly was necessary.    Reynolds v. Taylor, 43 Ala. 420; Gilbert v. Moody, 25 Pac. Rep. 1092; San Francisco v. Dunn, 69 Cal. 73; State v. Hickman, 9 Mont. 370; Thomas v. Owens, 4 Md. 189; State v. Weston, 4 Neb. 216; State v. Hickman, 10 Mont. 497; Riggs v. Brewer, 64 Ala. 284; Riggs v. Comptroller, 4 Stew. & P. 154; Opinion to Governor, 49 Mo. 216; State ex

rel. v. Bell, 119 Mo. 75; State ex rel. v. St. Louis Co., 34 Mo. 546.    (8)    The Act of March 15, 1899, despite its title, is as to the police system of St. Louis essentially an amendatory act, and the provisions of Act of 1861, re-enacted, are to be construed as continuing, and not as new enactments.    St. Louis v. Alexander, 23 Mo. 483; St. Louis v. Foster, 52 Mo. 513; State ex rel. v. Heidorn, 74 Mo. 411; State ex rel. v. Woodson, 128 Mo. 512; Black on Interp. of Laws, p. 368.    (9) The city of St. Louis is not a necessary party to this proceeding.    State ex rel. v. Smith, 89 Mo. 408; State ex rel. v. Smith 15 Mo. App. 412; Strother v. Green, 45 Cal. 149; State ex rel. v. Johnson, 123 Mo. 43.

*B. Schnurmacher* and *Chas. Claflin Allen* for respondent.

(1) The General Assembly can not delegate its legislative power to a mere ministerial board, or to mere executive officers. St. Louis v. Russell, 116 Mo. 248; State ex rel. v. Pond, 93 Mo. 606; State v. Patrick, 65 Mo. App. 653; Cooley's Const. Lim. (5 Ed.), 139.    (2)    Nor can the assembly legislate in part, and leave to other hands the completion of its work. Lammert v. Lidwell, 62 Mo. 188; O'Neill v. Ins. Co., 166 Pa. St. 72; Ford v. Harbor Comm. 81 Cal. 37; Smith v. Strother, 68 Cal. 194; Com. v. Adams, 95 Ky. 588; Pueblo Co. v. Smith, 22 Colo. 534.    (3)    The Act of March 15, 1899, under which relators claim to have organized, is violative of section 10 of article X of the Constitution of Missouri, which provides that the General Assembly shall not impose taxes upon counties, cities, towns or other municipal corporations, or upon the inhabitants or property thereof.    While the Act does not in terms give the police commissioners the power to levy a tax, it does give them power to create debts and obligations which the city can only discharge by means of taxation, and, therefore, brings the case within the condemnation of the constitutional provision.    Lovingston v. Wider, 53 Ill.

302; Wider v. East St. Louis, 55 Ill. 133; People v. Mayor, 51 Ill. 17. No such provision as section 10, article X, above referred to, was contained in the Missouri Constitution when the police Act of 1861, upheld in the case of St. Louis Police Commissioners v. St. Louis County Court, 34 Mo. 546, was passed. (4) The Act is also violative of section 1, Amendment XIV of the Constitution of the United States, in that it seeks to subject to the demands of the police commissioners any moneys in the city treasury without regard to whether the funds so sought to be made subject to said demands were derived by the city by means of taxation, or from the carrying on of enterprises by the city in its private corporate character; as for example, the operation of a waterworks plant, the maintenance of market buildings, and the like. Board of Comm. v. Lucas, 93 U. S. 108. (5) The Act violates sections 53 and 54 of article IV of the Constitution of Missouri. It is plainly applicable only to St. Louis, and it is equally plain that it was intended to apply only to St. Louis. Sections 4 and 7 of the Act clearly indicate this fact. The Act is therefore unconstitutional, although dressed up in general language and masquerading as a general law. State ex rel. v. Herrmann, 75 Mo. 340; State ex rel. v. Miller, 100 Mo. 439; Murnane v. St. Louis, 123 Mo. 479; Dunne v. Street Ry., 131 Mo. 1. (6) Mandamus will not lie against a disbursing officer unless an appropriation has been made to meet his warrant. In the absence of such appropriation he must decline to act, even though the claim submitted be otherwise correct. Merrill on Mandamus, section 105; State ex rel. v. Brown, 141 Mo. 21; State ex rel. v. Holladay, 64 Mo. 526; State ex rel. v. Holladay, 65 Mo. 76. (7) The auditor of the city of St. Louis can not draw his warrant upon the city treasurer in the absence of appropriation, for he is forbidden to do so by organic law. Constitution of Missouri, art. X, sec. 19; Charter of St. Louis, art. V, sec. 9, art. V, sec. 11, and art. IV, sec. 21. (8) (a) No appropriation whatever has been

made for the maintenance of the police force in St. Louis since August 20, 1899, when the Act of March 15, 1899, if valid went into effect; therefore, no money has been set apart for the maintenance of the police force organized by relators, and no warrant can be drawn by the auditor to satisfy the pay-roll submitted by them.    (b)   If the appropriation made to cover the expenses of the police department created under the Act of 1861 could be applied to the force as now organized, respondent properly refused to audit the pay roll as submitted, for it contains the names of officers for whom no appropriation whatever was then made, or made at any time since.

GANTT, C. J.—This is an original proceeding commenced in this court by the police commissioners of St. Louis, to obtain a peremptory writ of mandamus against the city auditor of St. Louis to compel him to issue warrants for the payment of the monthly pay-roll and police expenses for the month of August, 1899.

The return alleges the unconstitutionality of the Act of March 15, 1899, under which relators are proceeding as police commissioners, and denies that any appropriation has been made by the city for the payment of this pay-roll.   In view of the fact that nearly a thousand peace officers have been serving the State for three months without their monthly wages, the cause has been docketed and advanced as rapidly as the magnitude of the cause and the practice of the court would permit.

Since the year 1861 a metropolitan police system has been established in the city of St. Louis.   The original Act will be found in the Laws of Missouri, 1860-61, page 446. That Act supplanted the municipal system which had existed prior to that time, and provided in the third section that a board of police to be called the Police Commissioners of the City of St. Louis, consisting of four commissioners, should be appointed by the governor, and these together with the mayor

of the city were authorized and required to appoint and employ a permanent police force for said city.

The number of policemen was limited to the number then employed by the city. It was provided by the sixth section of the Act, that for "extraordinary emergencies the board might raise such additional force as the exigency may, in their judgment, demand."

As indicative of the purpose of the Legislature it may be noted that section 14 of the Act of 1861 provided for the organization of the board and notification of the city authorities, and continued: "From and after the first meeting aforesaid, the whole of the then existing police force in the city of St. Louis, both officers and men, shall pass under the exclusive management and control of the said board, and be subject to no other control, and entitled to receive neither orders or pay (except arrearages then due) from any other authority, and shall so continue, subject however to removal or suspension at the discretion of said board, and with power in said board to fill vacancies, until the board shall publicly declare that the organization of the police force created by this act is complete. Upon such public declaration, and from the time thereof thenceforward, all ordinances of the city of St. Louis, are hereby annulled and declared void, so far as they conflict with this Act, or assume or confer upon the mayor or any other person or persons the power to appoint, dismiss, or in any other way or to any extent employ or control any police force organized or to be organized under said ordinance, or any of them, and from and after such public declaration as aforesaid, the police force organized, or which may be organized under such ordinances, or any of them, shall cease to exist and all its functions and powers to be at an end."

Section 15 of the Act made it the duty of the board to estimate the sum of money required for each current fiscal year, to certify the same to the Board of Common Council of the city of St. Louis, who were required in the first appropriation

ordinance of the fiscal year to set apart and appropriate the amount so certified, payable out of the net annual revenue of the city of St. Louis, "after first having deducted the amount necessary to pay the interest upon the indebtedness of said city, the amount necessary for the expenses of the city hospital and health department, the amount necessary for lighting the city with gas, and the sum of ten thousand dollars required by law to be placed to the credit of the sinking fund of said city."

It was also provided in the same section that in case the Common Council failed to make the appropriation, or the disbursing officer of the city failed to pay the money over, that then the board were authorized to issue certificates of indebtedness for the amount, bearing interest at ten per cent per annum, payable not more than twelve months after date, and they were authorized to raise money by pledging or selling such certificates, which were receivable at par in the payment of city taxes and binding as obligations of the city.

Under section 16 of the Act, penalties by fine and imprisonment were provided against any officer of the municipality who should hinder or obstruct the organization of the police established by the Act, and in addition to fine and imprisonment it was provided that the party so convicted should thereafter be forever disqualified from exercising any office or employment under the city.

On the 5th day of February, 1864, this Act was amended by the General Assembly so as to require the county of St. Louis to pay one-fourth of the expense of maintaining this police force. The county court resisted the payment, insisting the act was unconstitutional for various reasons, but its constitutionality was sustained, after the most thorough argument. [State ex rel. Police Commrs. v. County Court, 34 Mo. 546.]

The Act of 1861 was afterwards amended at different times and twice construed by this court in State ex rel. Camp-

bell v. Board of Police Commissioners, 88 Mo. 144, and Francis v. Blair, 89 Mo. 291, and Francis v. Blair, 96 Mo. 515.

When the people adopted the Constitution of 1875, they provided that the city of St. Louis might frame its own charter, which, however, should be in harmony with and subject to the laws of Missouri. ` In that Charter, article III, section 26, subsection two, it was expressly provided, "that no system of police shall be established or maintained other than the present metropolitan system as long as the same is established by law." Accordingly no effort has ever been made by the city to substitute a municipal system of its own in lieu of that provided by the State, and it becomes unnecessary now to decide whether it has power to do so or whether such a system would not necessarily be out of harmony with the laws of the State and its settled policy, as evidenced by its legislation of 1861.

Such was the state of the law when the General Assembly of Missouri passed the Act of March 15, 1899.    [Laws of Missouri 1899, p. 51.]

That Act is entitled:

"An Act to repeal an Act entitled 'An Act creating a board of Police Commissioners and authorizing the appointment of a police force for the city of St. Louis,' approved March 27th, 1861, and all Acts supplementary to or amendatory thereof, and providing for the creation and organization in all cities having three hundred thousand inhabitants and over, of a board of police commissioners, and authorizing the appointment and providing for the government of a police force for such cities."

An analysis of the Act of 1899 will demonstrate that in the largest part it is identical in its terms with the law of 1861. The board is still to consist of four members, appointed by the governor and the mayor is *ex officio* a member, though he is no longer *ex officio* president.

The powers and duties of the board to maintain the public peace and order and the obligation imposed upon the city to pay the salaries of the police and expenses of the board are practically the same as in the Act of 1861, except the present board is shorn of the right to issue certificates of indebtedness if the city defaults in payment, but there are, however, some marked changes in the Act of 1899, and it is these which have become the basis of the assault by the auditor and city officers upon the constitutionality of the law and to the end that they be readily referred to in connection with a discussion of their validity, they are here reproduced:

"Sec. 6.   To enable the said boards to perform the said duties imposed upon them, they are hereby authorized and required to appoint, enroll and employ a permanent police force for the said cities, which they shall equip and arm as they may judge necessary. The number of policemen to be appointed shall not be less than eight hundred and fifty patrolmen and two hundred and fifty probationary patrolmen; the number of detectives to be appointed shall not be less than twenty-five; the number of turnkeys to be appointed shall not be less than thirty-five, and in the appointment of said turnkeys retired and disabled policemen shall be given the preference, together with the officers hereinafter mentioned, and such number may be increased to such additional force as extraordinary emergencies may require, and any Act of the Municipal Assembly or Common Council tending to diminish the number of men above specified shall be null and void. The boards alone shall have the power to determine whether such extraordinary emergencies requiring additional patrolmen exist or not, and their finding in the matter is not subject to review by any other power.   No person shall be appointed or employed as policeman, detective, turnkey or officer of police who shall have been convicted of, or against whom any indictment may be pending for any offense, the punishment of which may be confinement in the penitentiary; nor shall

any person be so appointed who is not of good character, or who is not a citizen of the United States, or who is not able to read and write the English language, or who does not possess ordinary physical strength and courage. The patrolmen, detectives and turnkeys shall be appointed to serve four years, and be subject to removal only for cause after hearing by the board, who are hereby invested with the exclusive jurisdiction in the premises. Any policeman or detective whose term of service shall expire and who, during his appointment, shall have faithfully performed his duties, shall, if otherwise qualified, be preferred by the boards in making new appointments.

"Sec. 7. The officers of police shall be as follows: One chief of police, with rank of colonel, who shall give bond with security, in the penal sum of twenty thousand dollars, for the faithful performance of his duties; one assistant chief of police, with rank of lieutenant colonel; one chief of detectives, with rank of major; one assistant chief of detectives, with rank of lieutenant; one inspector, with rank of major; one secretary of the chief; one superintendent of Bertillon system; twelve captains; twelve lieutenants, and one hundred sergeants. They shall have commissions issued to them by the board of police commissioners for a term of four years, and shall not be removed without cause during the term specified in said commission, and in issuing commissions under this Act, the officers now acting as such shall be reappointed and commissioned, unless the board for good cause, shall determine otherwise, and any Act of the common council or municipal assembly to diminish the number of officers above specified shall be null and void.

"Sec. 8. The chief of police shall receive five thousand dollars per annum, payable in monthly instalments; the assistant chief of police shall receive thirty-eight hundred dollars per annum, payable in monthly instalments; the chief of detectives shall receive thirty-five hundred dollars per an-

num, payable in monthly instalments; the assistant chief of detectives shall receive eighteen hundred dollars per annum, payable in monthly instalments; the secretary of the police board shall receive a salary of twenty-five hundred dollars per annum, payable in monthly instalments; the inspector shall receive twenty-five hundred dollars per annum, payable in monthly instalments; the secretary to the chief shall receive two thousand dollars per annum, payable in monthly instalments; the superintendent of the Bertillon system shall receive eighteen hundred dollars per annum, payable in monthly instalments; each captain shall receive twenty-four hundred dollars per annum, payable in monthly instalments; each lieutenant shall receive fifteen hundred dollars per annum, payable in monthly instalments; each sergeant shall receive thirteen hundred and eighty dollars per annum, payable in monthly instalments; each detective shall receive thirteen hundred and eighty dollars per annum, payable in monthly instalments; each patrolman shall receive ten hundred and eighty dollars per annum, payable in monthly instalments; each probationary patrolman shall receive seven hundred and eighty dollars per annum, payable in monthly instalments; each turnkey shall receive seven hundred and eighty dollars per annum, payable in monthly instalments.

"The rate of salaries herein provided shall not be less than the amounts above enumerated, and any act of the municipal assembly or common council of the said cities tending to lower the above scale shall be null and void.    It shall be the duty of the municipal assembly or common council of the said cities to make the necessary appropriation for the expense of maintenance of said police force in the manner hereinafter provided.

"Sec. 13.  It shall be the duty of said boards within thirty days after this Act shall take effect, and annually thenceforward on the 31st day of March of each year to prepare, in writing, an estimate of the sum of money which will be nec-

essary for each current fiscal year, to enable them to discharge the duties hereby imposed upon them, and to meet the expenses of the police department, and they shall forthwith certify the same to the board of common council or municipal assembly, as the case may be, of said cities, who are hereby required to set apart and appropriate the amount so certified, payable out of the revenue of said cities, after having first deducted the amount necessary to pay the interest upon the indebtedness of said cities, the amount necessary for the expenses of the city hospital and health department, the amount necessary for lighting the city, and the sum required by law to be placed to the credit of the sinking fund of said cities. The said boards of police commissioners shall pass upon all claims presented against them for the expenses incurred in the discharge of their duties as herein provided and shall certify, by their president and secretary, all such claims as are entitled to payment and all salary-rolls for salaries as provided in this Act, and such claims and salary-rolls, when so certified, shall be duly audited and paid by the proper disbursing officer or officers of said cities within five days after being audited, out of any moneys in the city treasury not appropriated to the specific purposes above enumerated: Provided, however, that the amount of said claims and salary-rolls so certified shall not exceed, in any one year, the amount so, as aforesaid, estimated for that year to the common council or municipal assembly of said cities aforesaid. The common council or municipal assembly of said cities shall have no power or authority to levy or collect any taxes or appropriate any money for the payment of any police force, other than that organized and employed under this Act. No officer or servant of the mayor or the common council or municipal assembly of said cities shall disburse any money for the payment of any police force other than that organized and employed under this Act, and the power of said mayor and common council or municipal assembly to appropriate and disburse money for the payment

of the police force organized and employed under this Act shall be exercised as in this section directed, and not otherwise."

Other provisions of the Act as to the powers and duties of the board in the maintenance of the force, in the preservation of the public peace and the qualifications of the appointments on the force, are not involved in this proceeding, and therefore it is unnecessary to set them out in full. Section 14, imposing penalties for obstruction of the board or interference with the enforcement of the Act, is identical with section 16 of the Act of 1860-1861. Section 25 re-enacts the Act of 1861 as amended by section 11, of the Act of 1867 (Laws 1867, p. 179), in providing that the members of the police force are officers of the city and also officers of the State of Missouri.

This Act was adopted without an emergency clause and therefore if constitutional and valid it took effect August 20, 1899. After the passage of this Act the then board of police commissioners made an estimate in writing of the amount required to pay the force and other expenses of the department for the year beginning April 1, 1899, and ending April 1, 1900, that estimate being based on the schedule of salaries and force provided under the law of 1861 and amendments thereto up to August 20, 1899, and after that upon the number of the force and salaries fixed by the Act of March 15, 1899, making a total of $1,565,545, and certified the same to the Municipal Assembly of St. Louis.

On August 7th the Municipal Assembly passed the annual appropriation bill, ordinance No. 19835, and in it and by it appropriated $962,340 for the police department for the fiscal year ending March 31, 1900, distributing the same under the law existing prior to March 15, 1899. The expenses of the men and the board were paid down to August 1, 1899.

On Wednesday, August 16, 1899, four days before the

Act of March 15, 1899, could take effect and before commissions had issued to the board thereby created, the city of St. Louis applied for and obtained from Judge WITHROW, of the Circuit Court of the City of St. Louis, a temporary injunction restraining the members of the police board from reorganizing the police force or taking any action under the Act of March 15, when it should take effect August 20, 1899. On August 18, a writ of prohibition was issued by one of the Judges of this court prohibiting Judge WITHROW and Judge FISHER, for whom the former was acting, from enforcing said injunction and directing the same dissolved.

On August 21, the Act of March 15 having according to its terms become operative, the relators who had been appointed under the old law and whose terms had not expired, were continued in office and proceeded to and did organize under the Act of March 15, Mayor Ziegenhein refusing to cooperate with them.    By the third section, however, his failure to act in nowise impaired the right of the other four members to proceed as required by the Act.

Thereupon the board organized the force and increased the number of patrolmen from 685 to 850 with 250 probationary patrolmen, with the number of detectives and turnkeys, sergeants, lieutenants, captains and other officials, in each case limiting the number to the minimum number specified in the Act.    This force immediately went to work and has ever since constituted the only protection of the city.

On the first day of September, the new police board allowed and certified the pay-rolls in due form both for the men's salaries and the expenses incurred; that is to say, the amount due each member from the last day of July to and including August 20, 1899, at the salary fixed by law up to that time, and from August 21, to and including August 31, 1899, according to the schedule of salaries fixed by the Act of 1899.

The city auditor refused to audit the claims and salary-rolls thus certified, on the ground that the Act of 1899 was

unconstitutional and that no appropriation had been made, and because since the Act went into effect the police board had not certified the estimate required by section 13 of said Act.

After the refusal of the auditor the board on September 12, 1899, prepared a new estimate in writing of the moneys necessary for the current fiscal year ending March 31, 1900, and certified that to the Municipal Assembly and then on September 13, 1899, again delivered to the auditor the certified pay-rolls in due form and he again refused to audit the same.

Thereupon relators sued out the alternative writ of mandamus in this case, setting out the above facts.

The respondent files his return, substantially admitting the facts as above stated, but claiming that the Act of March 15, 1899, is unconstitutional: First, in that section 6 involves an unlawful delegation of legislative power in that, it is claimed, it gives the board the power to fix the number of the force, provided the number exceed the minimum named; second, that the Act is violative of section 10 of article X of the Constitution, in that it imposes taxes upon the municipality without its consent; third, that it is violative of section 1 of article XIV of the amendments of the Constitution of the United States, in that the city has a large amount of property, income from waterworks, franchise privilege charges, etc., which property is, in effect, taken for police purposes without the consent of the city; and fourth, that the Act is violative of sections 53 and 54 of article IV of the Constitution, in that it is special legislation applicable only to the city of St. Louis. The return also sets up that even if the Act of March 15, 1899, is valid, there was no appropriation available for the pay-roll under the city charter, that only one-twelfth of the annual appropriation can be used each month and that one-twelfth of the amount appropriated is insufficient to pay the rolls certified.   And that section 13 of the Act of March 15,

1889, had not been complied with, in that no certified estimate was submitted to the Municipal Assembly as provided by the law.

The return also sets up the injunction proceeding above referred to, and that the city of St. Louis is not a party to the proceeding.

To the sufficiency of this return, relators demur, and the case is submitted thereon.

I. The fundamental principles underlying the Acts of 1861 and 1899, creating boards of police commissioners for the city of St. Louis, are the same, and the constitutionality of such legislation has stood the test of the most critical judicial examination and review. Laws like these and those of other States providing a metropolitan police system for large cities, are based upon the elementary proposition that the protection of life, liberty and property and the preservation of the public peace and order in every part, division and sub-division of the State, is a governmental duty which devolves upon the State and not upon its municipalities any farther than the State in its sovereignty may see fit to impose upon or delegate it to the municipalities. The right to establish the peace and order of society is an inherent attribute of government, whatever its form, and is co-extensive with the geographical limits thereof, and touching every part of its territory.

From this duty existing in the very nature of the State government, flows the corresponding power to impose upon municipalities of its own creation a police force of its own creation, and to compel its support out of the municipal funds. Such is the conceded doctrine by the most learned of our writers upon constitutional law, and such the consensus of judicial decision throughout the United States.

Wherever the Legislature has the right to assume control of a municipal office, it has likewise the right to compel the city to provide for defraying the expenses of such office,

and while it is sometimes difficult to draw the line and distinguish whether a given office is of a public or State character or is simply one to subserve a municipal function, it is almost universally conceded that police boards and metropolitan police forces are State officers and fall clearly within legislative control.

The learned city counselor does not controvert this statement, but admits that in the absence of constitutional limitations the State may not only create a police force for the preservation of the peace and the protection of the property of St. Louis, but may require the city to furnish the funds for the payment of such force. Inasmuch as the doctrine he concedes lies at the basis of the further discussion of this case, it will not be amiss to show how unanimous the courts and lawwriters are on this question.

Judge COOLEY in his work on Taxation (2 Ed), p. 681, says: "One of the first and highest of all duties devolving upon the State is to preserve the public peace. For this purpose, peace officers are chosen, judges selected, the militia organized, and the executive armed with very high powers to meet the contingencies of riot and disorder. . . . . In general, the belief has prevailed that the public peace and good order were better preserved by apportioning the duty among the several municipal divisions, retaining only a State supervision over all. . . . . But if the local authorities were allowed unlimited discretion to levy or refuse to levy the necessary taxes for the support of the local police force, it might possibly happen, that, from neglect or refusal to do so, one part of the State might be left a prey to disorder and violence, to the general detriment of the State at large. Of course no State could safely, for a single day, tolerate such a condition of affairs.

"A city or township could no more be left at liberty to decline taxation for police purposes, when the police laws and

police force, and the tax which supports them are made by local law, than if all were general.

"The police organization of the State is really general, however it may vary in different localities, and the obligation to support it is general, however it may be apportioned. . . . . The power that prescribes police regulations and varies them to meet the needs of different localities has undoubted authority to apportion the money raised for general purposes, on its own view of the local needs. The Legislature may, therefore, require a county to appropriate part of its revenue to the special needs of the police board within its limits, *and an act for that purpose is liable to no constitutional objection.*"

Judge DILLON in his admirable work on Municipal Corporations (4 Ed.), in note 1 to section 60 says: "There is nothing in the maxim that 'taxation and representation go together,' that can preclude the Legislature from establishing in a city a metropolitan police board, with power to estimate the expenses of the police, and compelling the city authorities to raise by taxation the amount so estimated. Every city is represented in the state legislature; and it is for that body to determine how much power shall be conferred by the municipal charters which it grants."

Judges COOLEY and DILLON in these extracts clearly sum up the result of the authorities. Thus in People ex rel. Drake v. Mahaney, 13 Mich. 481, an Act of the Legislature creating a board of police commissioners for Detroit, was assailed as unconstitutional, but it was successfully defended by the court in an opinion by Judge COOLEY. One remark in the opinion is peculiarly applicable here. He says: "The taxation under this Act, it is said, is really in the hands of a police board, a body in the choice of which the people of Detroit have no voice. The argument is one which might be pressed upon the legislative department with great force, *if it were true in point of fact.* But as the people of detroit are really represented throughout, the difficulty can hardly be regarded

as fundamental. They were represented in the Legislature which passed the Act, and had the same proportionate voice there with the other municipalities in the State, all of which received from that body their powers of local government and such only as its wisdom shall prescribe within the constitutional limit. They were represented in that body when the present police board were appointed by it, and the governor, who is hereafter to fill vacancies, will be chosen by the State at large including their city" (Detroit).

In Commonwealth v. Plaisted, 148 Mass. 375, there came under review a statute under which the Governor of the State, with the advice and consent of the council, was required to appoint from the two principal political parties three citizens of Boston who should constitute the police board of said city. The police for the city was to be appointed, and was subject to removal by this board. Said the Supreme Judicial Court: "It is also suggested, though not much insisted on, that the statute of 1885 is unconstitutional, because it takes from the city the power of self-government in matters of internal police. We find no provision of the Constitution with which it conflicts. . . . . The several towns and cities are agencies of government largely under the control of the legislature. The powers and duties of all the towns and cities, except so far as they are specifically provided for in the Constitution, are created and defined by the legislature, and we have no doubt that it has the right in its discretion to change the powers and duties created by itself, and to vest such powers and duties in officers oppointed by the Governor," etc.

In 1860 the legislature of Maryland provided a metropolitan police system for the city of Baltimore and to carry it into effect itself appointed three commissioners upon whom it conferred the power of organization of said force. The Court of Appeals of that State in Baltimore v. State Board of Police, 15 Md. 376, 74 Am. Dec. 572, upheld the constitu-

tionality of the law, and the right of the legislature to name the commissioners.

The State of Louisiana by its legislature created a police board with powers similar to those granted by the act under consideration, and it was challenged by the mayor of New Orleans, but the Supreme Court affirmed its constitutionality. [Diamond v. Cain, 21 La. Ann. 309.] So, likewise, the same character of legislation has been upheld by the Supreme Court of Kansas in State ex rel. Atwood v. Hunter, 38 Kan. 578, and of Ohio in State ex rel. Atty-Gen. v. Covington, 29 Ohio St. 102. But in no decision which has fallen under our observation, have we found such a luminious discussion of the power of the legislation to create a metropolitan police system by the direct action of the State, independent of the municipality, and to impose the support thereof on the locality as is to be found in the brief of counsel and the opinion of the court in State ex rel. v. County Court, 34 Mo. 546, and in Hamilton v. County Court, 15 Mo. 20. In those cases the power of the Legislature to provide the necessary agencies to perform the high functions of the State in the preservation of the public peace and the protection of life and property, and to impose the duty of paying therefor on the locality for which and in which said agencies were created, was fully and firmly established and nothing new has been said in any of the cases since, and they have been uniformly followed by this court in subsequent cases. [State ex rel. v. Field, 119 Mo. loc. cit. 613; St. Louis v. Shields, 52 Mo. 354; State ex rel. v. Pike County, 144 Mo. 275.]

II. But says the counsel for the City Auditor, while we grant all that has been said so far, still we say this Act is unconstitutional because the General Assembly has delegated its own unquestioned power to legislate to a mere ministerial board of mere executive officers. Let us examine this contention. In a word, the learned counsel asserts that when the Act of March 15th left the hands of the General Assembly,

it was not a complete law, but by its terms it must needs be supplemented by the executive board it purported to create, before it could become operative, and proceeding from this premise he next asserts that the policemen to be appointed by the board are officers by all the tests recognized by law, to wit, their tenure is fixed and permanent, and their salaries payable out of the public funds.   Finally he insists that the power of creating these offices has been delegated to this board of police commissioners, a mere administrative body. After all, this is the decisive point in this case, and upon its proper solution depends all the other questions.

The argument is made and ably sustained, that section six of the Act of March 15, 1899, nowhere establishes the number of policemen and police offices to be filled by the board but has delegated the number entirely to the discretion of the board, with the single limitation upon their power that they shall not fall below certain stated figures.

Two answers are made to this insistence.

First.   While the language of the Act is unhappy and by segregating certain words color is given to the contention of the city counselor, still when the whole section and Act are read together, it is plain that the Legislature intended to and did limit the *permanent* force to the number of 850 patrolmen, 250 probationary patrolmen, 25 detectives and 35 turnkeys.   This we think is fairly and reasonably deducible from section 6 itself, for, after providing that the number shall not be less than that above designated, the Act proceeds, "and *such number* may be increased to such additional force as *extraordinary emergencies may require,* and any act of the municipal assembly or common council tending to diminish the number of men *above specified* shall be null and void." The *only increase then,* beyond the *exact number* which the Legislature has fixed which is authorized, *is one for extraordinary emergencies.* Such is the construction which the board has put upon the Act, and such we think is the correct con-

struction. The Act is not a delegation to that board to appoint permanent policemen *ad libitum*, but the number designated by the Legislature and in emergencies of riots, overwhelming disasters such as the tornado which wrecked the lighting apparatus and enveloped the city in darkness to appoint temporarily an additional force for and during the emergency only.

Second. But if we are driven to say that the language of section 6 is susceptible of either reading; that it might be construed as the city counselor has done, our duty is plain, and it is to give it that interpretation which will reconcile the statute with the Constitution, and that reading which both sides concede would render it safe from constitutional objections and still give the Act full force and effect, and this should be done even though it may be necessary to disregard the more usual or apparent import of the language employed. [Woodward v. Fruitvale Sanitary District, 99 Cal. 554; Palms v. Shawano County, 61 Wis. 211.]

It is our duty to uphold and enforce an act of the Legislature if we can construe it to be constitutional. Reading this act then in all its parts and with a view to effectuate the great purpose in view, that of providing our great metropolis with an adequate constabulary, it is our judgment that the Legislature fixed the number of the permanent police force at 850 patrolmen, 250 probationary patrolmen, 25 detectives and 35 turnkeys, in addition to the chief, captains, and lieutenants and sergeants, and accordingly we must rule that the objection to the Act on the ground that it was not a complete law, when it was adopted, is not well taken.

This we say with reference to the permanent force. As to the power to increase the force for *extraordinary emergencies*, that clause of the Act is not before us for adjudication, for as yet the board has appointed only the number of permanent policemen fixed by the statute. The same provision,

however, was in the Act of 1860-61, and has been enforced by the various city administrations without regard to their partisan character for 38 years. It has, however, always been construed to authorize temporary policemen for an emergency only and it was never claimed that an appointment under this clause created a policeman a member of the police force for four years. But be that as it may it is not before us in this case, and such questions can only be authoritatively decided when the board assumes to exercise that power, nor for the same reason is it proper for us to discuss and adjudicate upon the power of the board to increase the permanent force beyond which defendant denominates the minimum. No attempt has been made to do so, and sufficient unto the day is the evil thereof.

III. Still another constitutional objection is raised to this act. It is charged that it violates section 10 of article X of the Constitution of Missouri, which prohibits the General Assembly from imposing "taxes upon counties, cities, towns or other municipal corporations or upon the inhabitants or property thereof, for county, city, town or other municipal purposes, but may, by general laws, vest in the corporate authorities thereof the power to assess and collect taxes for such purposes." In view of the discussion already had in the first paragraph of this opinion, in which we hold that the preservation of the peace and protection of life and property is a *State*, and not a *municipal* function, it would seem obvious that this provision of the Constitution has no application to the fund required to support the police department.

The inhibition does not extend to a State tax, but to municipal taxes, and this is distinctly a State tax, for a strictly State purpose.

In State ex rel. v. Field, 119 Mo. loc. cit. 614, this court in Banc said, "We deem it within the power of the Legislature to impose a tax upon a particular sub-division or municipality of the State, when, in its judgment, it is for the benefit

of that locality as well as the State at large," and such has continued to be the rule in similar cases.    [State ex rel. v. Owsley, 122 Mo. 68; State ex rel. v. Board of Education of St. Louis, 141 Mo. 49.]

It can not be true that the Legislature exercising the sovereign power of the State to legislate, can create a police board, impose upon the city the duty of maintaining it, and yet be powerless if the city, an agency of its own creation, sees fit to attempt to thwart the prime purpose of its existence as such.

In this connection it may be well to note that the tax required in this case to maintain the police is levied by the city in obedience to a law of the State.    The State creates the offices for the protection of its citizens and for the benefit also of the city as such, fixes the number of incumbents and their annual salaries and time of payment.    The sole duty of the board is to select proper persons to fill the offices.    The argument that a board without responsibility to the municipality, levies the tax, is utterly without foundation.    The State levies and requires one of its own agencies to collect and pay over the tax to liquidate a certain, not an unlimited sum, when demanded by its other agency, the board, and it does not lie in the mouth of the city to plead other obligations as superior to the demands of its creator.    It is not for one moment to be presumed that the State which organized and chartered the city, would hinder its performance of the duties, which the State had imposed upon it, nor can it be tolerated that the city shall assume obligations superior to those which the State has declared shall be preferred charges upon its revenues.    Moreover, there is nothing in the number of policemen and probationaries, the two aggregating about eleven hundred men, which smacks in the slightest degree of arbitrary or unreasonable regulation in the force provided for a city of seven hundred and fifty thousand people, and constantly increasing. On the contrary the Legislature might justly be charged with

indifference to its governmental trust, had it been unmindful of the rapid growth of the city and the corresponding necessity for a larger and more efficient police force. The query of learned counsel for the auditor, "Has the General Assembly the further power to require such appropriation to be made in preference to appropriations for other equally necessary departments out of *any revenue* of such cities, as is attempted by the 13th section of the Act of March 15, 1899 ?" is unhesitatingly answered in the affirmative. The State is the source of all power in the city to collect revenue at all, and has the same power over the revenues of the city collected under and by virtue of the laws of the State as it has over state and county revenue, and can require such portion as it may direct to be paid to the support of its constabulary in preference to any purpose which the city might perchance deem more essential. [Ray County to use v. Bentley, 49 Mo. 236; State ex rel. v. Board of Education of St. Louis, 141 Mo. 45; State ex rel. v. Field, 119 Mo. 593; State ex. rel. v. Owsley, 122 Mo. 68.]

IV. So much of the argument indulged in to demonstrate that the act under consideration is a special and not a general law, is inapplicable to legislation of this character, St. Louis is organized directly under the Constitution. It is not in either of the four classes of cities which have been defined by the Legislature under the Constitution. It would have been entirely appropriate for the Legislature to have designated St. Louis by name instead of referring to it as a city of over three hundred thousand inhabitants. As was said in Kansas City v. Stegmiller, 151 Mo. loc. cit. 204: "It follows that the Legislature may legislate directly for these constitutional cities without infringing the Constitution, and in legislating therefor it does not create a new class but simply provides for a class created by the Constitution. Having expressly provided for these constitutional cities and having also provided in section 15 of the Schedule of the Constitution that

'the General Assembly shall pass such laws as may be necessary to carry this Constitution into full effect,' it has become the settled rule of decision in this court that no law can be either local or special within the meaning of the Constitution which has for its object and purpose the carrying out of the constitutional command. . . . . As to subjects which bear upon their relation to the State government the General Assembly can by a general law provide for their government." [Ewing v. Hoblitzelle, 85 Mo. 64; Kenefick v. St. Louis, 127 Mo. 1; State ex rel. v. Higgins, 125 Mo. 364; Spaulding v. Brady, 128 Mo. 653.] Such is the law under review and it does not infringe the Constitution.

V.    But it is urged that this Act is invalid not only because it violates the organic law of Missouri, but is also violative of section 1 of the Fourteenth Amendment of the Constitution of the United States, in that it seeks to subject to the demands of the police commissioners "any moneys" in the city treasury (after first providing for the interest on the municipal debt, the expenses of the city hospital and health department, the city lighting and the sinking fund) without regard to whether the funds so sought to be made subject to said demands were derived by the city by means of taxation or from carrying on of enterprises by the city in its private corporate character, such as its waterworks, market buildings and the like.

This part of the return places the auditor in a most embarrassing position.    He insists in one breath that the Act of 1860-61 is still in force, and yet in principle that Act is identical with the act he refuses to obey in this respect.    For thirty-eight years neither he nor his predecessors ever challenged section 15 of the Act of 1860-61 as in conflict with the Fourteenth Amendment, and yet that section required the Municipal Assembly "to set apart and appropriate the amount so certified (by the police board), payable out of the net annual revenue of the said city of St. Louis, after first having

deducted the amount necessary to pay the interest upon the indebtedness of the city, the amount necessary for the expenses of the city hospital and health department, the amount necessary for lighting the city," and $10,000 required to be placed in the sinking fund.

It will be seen that the only material change in the Act of 1899 from the Act of 1861, other than the elimination of the provision for issuing certificates of indebtedness, is the change of the "amount necessary for lighting the city with gas," and from "ten thousand dollars as the sum required by law to be placed to the credit of the sinking fund" to "the sum required by law to be placed to the credit of the sinking fund," and from "the amount appropriated by the city of St. Louis for maintaining the police of that city during the year 1860" to "the amount so, as aforesaid, estimated for that year." Why invoke a Federal question against the one, and promptly honor the other?

But conceding that a public municipality can have in its public or general treasury funds as a private proprietor discharged from the control of the State in the preservation of the public peace and order, it is clear that neither the old law nor the present act would be obnoxious to the charge of seeking to appropriate any portion of said funds except "the revenue of said city," which in both clearly refers to moneys derived from taxation and other municipal funds which are not impressed with a trust. So that as a matter of fact the Federal question so ingeniously sought to be injected into the case, does not and can not arise.

The authority cited by respondent, Commissioners v. Lucas, 93 U. S. 114, disposes of the contention. Mr. Justice FIELD says: "But between the State and the municipal corporations, such as cities, counties and towns, the relation is different from that between the State and the individual. Municipal corporations are mere instrumentalities of the State, for the convenient administration of government; and their

powers may be qualified, enlarged or withdrawn at the pleasure of the Legislature. Their tenure of property, derived from the State for specific *public* purposes, or obtained for such purposes through means which the State alone can authorize, that is, taxation, is so far subject to the control of the Legislature, *that the property may be* applied to other public uses of the municipality than those originally designated." It is sufficient in this case that the State only demands a portion of that *revenue*, the product of taxation, license taxes and other public municipal charges, nor does the return show any moneys in its revenue fund derived for other than a public use either state or municipal.

Indeed, it is averred in the return itself that these so-called private funds are in the general treasury of the city; that is to say, a part of a public fund upon which the city draws its warrants without discrimination in the payment of its public debts. But more than all these, there is no allegation that the payment of this demand would require other than confessedly public funds in the treasury, and hence the matter may be finally dismissed with the remark that such issue is not raised by the return in a way to avail defendant even if it were true that the State would be affected by such a plea.

VI. Having considered the constitutional objections to the validity of the Act and found them insufficient we come now to the technical plea that the writ of mandamus is not available to relators.

The jurisdiction of this court in a proper case is not questioned; it is as broad as the exigency of the case demands. [State ex rel. v. Philips, 97 Mo. 331].

"The general rule is that when a plain and imperative duty is specifically imposed by law upon the officers of a municipal corporation, so that in its performance they act in a ministerial capacity, without being called upon to exercise their own judgment as to whether the duty shall or shall not

be performed, mandamus is the only adequate remedy."
[High's Ex. Leg. Remedies (3 Ed.), sec. 324.]

Recurring now to the Law of 1899, the 13th section
provides: "The said boards of police commissioners shall
pass upon all claims presented against them for the expenses
incurred in the discharge of their duties as herein provided
and shall certify, by their president and secretary, all such
claims as are entitled to payment and all salary-rolls for salar-
ies as provided in this act, and such claims and salary-rolls,
when so certified shall be duly audited and paid by the proper
disbursing officer or officers of said cities within five days after
being audited," etc.

The general rule is that when a claim has been allowed
by the board or officer charged by law with the duty of pass-
ing on its validity or amount, it then becomes the duty of the
auditor to audit the same and draw his warrant on the dis-
bursing officer. [State ex rel. v. Johnson, 123 Mo. 43; Sher-
idan v. Fleming, 93 Mo. 321; Merrill on Mandamus, secs. 126,
104 and 105; High on Extr. Leg. Rem. (3 Ed.), sec. 351;
Lindsey v. Auditor, 3 Bush. (Ky.) 231; Danley v. Whiteley,
14 Ark. 687; Hunt v. Broderick, 104 Cal. 315; In re Freel,
148 N. Y. 165.]

It is admitted by relators, that, ordinarily, mandamus
will not lie against the disbursing officers of the city to compel
them to audit and pay claims in the absence of an appropria-
tion for such claims and salaries. The reason is that, in the
absence of such appropriation, it is not only not the clear legal
duty of such officers to audit and pay the claims, but they are
specially forbidden by law to do so. The city charter, in
article IV, section 21, provides that: "The auditor shall ex-
amine, adjust and audit all unsettled accounts, claims and
demands against the city, for the payment for which any
money may be drawn from the city treasury; and, after having
examined the same, with all accompanying vouchers and docu-
ments, shall certify thereon the balance or true state of such

claim or demand, and draw his warrant on the treasury in payment thereof; but no such claim or demand, or any part thereof, shall be audited against the city, unless it is authorized by law or ordinance, and is in a proper and fully itemized form, and unless the amount required 'for the payment of the same shall have been appropriated for that purpose by the assembly." And article V, section 11, of the charter provides that: "No money shall be paid out of the treasury except on the auditor's warrant, and no warrant shall be issued on any appropriation unless there is an unexpended balance to the credit thereof sufficient t? ?over such warrant, and money in the treasury to pay it."

While the general rule is as above stated, and while the city charter contains the provisions above set forth, yet relators claim there is no necessity for such appropriation by the Municipal Assembly in this instance, because:

*First*, the act itself makes the appropriation; and,

*Second*, the appropriation made by the Municipal Assembly for the support of the police, although made under the law of 1861, is applicable *pro tanto* to the requisitions of the present police board.

The origin of this legislation and the language of the act itself forbid the construction that the State should be a suppliant at the doors of the Municipal Assembly. Having determined for itself to keep the protection of the public peace in its own hands, having fixed the number of police officers and patrolmen necessary for that purpose and determined the tenure of their offices and the salaries each should receive, and having provided its own auditing board to ascertain the expenses of the department and the salary-rolls, it has not left that department of the State government dependent upon the grace or caprice or judgment of the City Council or Municipal Assembly, but has required in the most specific language that when the police board has duly certified the amount to the auditor he shall audit the same and then it shall

be paid, not out of moneys which the assembly shall thereafter appropriate, but "out of any moneys in the city treasury not appropriated for the specific purposes which the Legislature had itself preferred." While the act intends and anticipates that the municipal authorities will obey the laws of the State, and make the necessary appropriation, and that the auditor will audit the amount certified, it nevertheless serves notice that the failure of the assembly shall not defeat the purpose of the Legislature and the chief end of municipal government, to wit, the better protection of the lives and property of the people of such city or town. If we are right in our previous declaration that the State in the exercise of a State function can constitutionally require one of its cities, towns or counties to levy and collect a tax to further and support a State purpose in that city, town or county, and may even require such municipality to use revenue collected for one purpose, for a different purpose, without being amenable to the charge of disturbing vested rights, certainly the Legislature could lawfully make this appropriation directly, and the only question is, did it do so, and we think it did. The fact that St. Louis is organized under a constitutional freeholders' charter does not affect the question, because as to all subjects bearing on the relation of its relation to the State government the General Assembly has the same power over its affairs as over any other city, but no claim has been made by the city that it had or has the right to substitute its own police system for that of the State; on the contrary, when it exercised its rights to frame its own charter it specifically declared that so long as the present metropolitan system should be established by law it took upon itself the cost of maintaining the same.

That the Act of 1899 continued the then system and was merely an amendment of that law is obvious notwithstanding the use of the formal words repealing the Act of 1860 and

1861 and amendments and re-adopting the same in the form of a new law.

The new law must be construed as a continuing act as to all the provisions which were carried forward from the old to the new.

The authorities are quite unanimous in holding that where the constitution or an act of the Legislature creates an office and fixes the salary thereof, the time of the payment of the same, and authorizes or directs the comptroller or auditor to draw his warrant to pay the same, that the constitution in the one case and the legislature in the other thereby makes the appropriation, and no further appropriation is necessary to authorize the auditor to draw his warrant for its payment. [Reynolds v. Taylor, 43 Ala. 420; Gilbert v. Moody (Idaho), 25 Pac. Rep. 1092; San Francisco v. Dunn, 69 Cal. 73; State ex rel. v. Hickman, 9 Mont. 370; Thomas v. Owens, 4 Md. 189; State ex rel. v. Weston, 4 Neb. 216; State ex rel. v. Hickman, 10 Mont. 497; Riggs v. Brewer, 64 Ala. 282; Nichols v. Comptroller, 4 Stew. & P. (Ala.) 154. See generally, Opinion to Governor, 49 Mo. 216.]

Our conclusion then is that even if the Municipal Assembly had not made an appropriation in obedience to the demand and of the estimate of the board, it was still the plain legal duty of the auditor to draw his warrant for the pay-rolls and expenses certified to him on September 1st, by the police board, payable out of any money in the city treasury not included in the exceptions of the Act of 1899 itself.

But was there not in fact an appropriation by the municipal assembly? After the enactment of the Act of March 15, to wit, on August the 7th, 1899, the said assembly passed an annual appropriation bill whereby it appropriated $962,340 for the expenses of the police department for the fiscal year ending March 31, 1900; $808,300 of which was for the salaries of the chief, eight captains, seventy-one sergeants, six hundred and eighty-five patrolmen and sixteen detectives,

$4,000 for salaries of the board, $42,000 for current expenses, $3,500 for horses, $5,000 for labor and materials, $5,000 for stables, $5,500 for station house. This sum of $962,340 was in the city treasury definitely set apart by the Municipal Assembly for the payment of the force and for the expenses of the department.

This ordinance was passed and this appropriation made in obedience to a law of the State then in force and with full knowledge that it was entirely competent for the Legislature to amend the existing law and increase the charge of said police department. It is general in its terms. It does not attempt to restrict said appropriation to the payment of a force appointed under any special act of the Legislature. It simply appropriates so much for a metropolitan police department and force. Here the appropriation was made, and as all ordinances of said city are required by the Constitution to be subject to and in harmony with the Constitution of Missouri, in legal intendment it must be held that the Municipal Assembly appropriated this money for such police department as the State in its wisdom saw fit to impose on said city. Keeping in mind that the sole function and duty of the Municipal Assembly was to provide the fund and not to distribute it, the facts that the Legislature increased the amount required, would not excuse the auditor from auditing the amount certified to him so long as there was as in this case, a fund in the treasury for this specific purpose. It was not his duty to look after the deficit, if any shall hereafter occur. This court can not and will not presume that a municipality existing by virtue of the Constitution of this State deliberately intended to set itself up in defiance of the Legislature of the State. When an act is consistent with a lawful purpose it will be presumed that the intention was lawful rather than unlawful. We hold therefore that when this August pay-roll and expense account was certified to the auditor there was then in the city treasury an unexpended appropriation of $962,340 against which it

was his duty to draw his warrant and out of which the treasurer could and must pay said warrants.

The fact that the ordinance makes certain artificial divisions of this fund is immaterial. The whole is devoted to the disposition which the Act of March 15, 1899, makes. The appropriation, so far as it goes, is a *pro tanto* compliance with the law, and if it shall be exhausted the Municipal Assembly will make further appropriations to meet the deficit, but at present the fund is appropriated and in the treasury to meet the current demands and past due accounts of the force. There is no force in the plea that the auditor must draw his warrant for one-twelfth of the amount appropriated, and that the pay-roll certified exceeded one-twelfth. There is nothing in the ordinance itself directing or limiting him to one-twelfth of the amount appropriated, and if it had been it would have been out of harmony and in conflict with the controlling law of the State, to wit, the Act of March 15, 1899, and to that extent would have been void.

Neither is the city of St. Louis a necessary party to this action. The duty of the city auditor in auditing these pay-rolls, after they were certified to him, is purely ministerial. The Municipal Assembly was bound to take notice of the passage of the Act of March 15, 1899. Though it did not take effect until August 21, 1899, they were notified that it required a provision to be made for the fiscal year ending March 31, 1900, and when the board certified the estimate to them it was their plain, obvious duty as officers under the laws of this State to obey the law.

The police board made a second estimate and served it after the Act went into effect, and lodged it with the proper city officers.

The assembly by adjourning could not of course thwart the purpose of the Legislature in this way, and we do not suppose this was their intention. The board has, however, per-

formed every duty exacted by the law, and nothing remains but for the city officials to obey its commands.

The fact that the whole police force has for three months guarded the city and protected its peace without one dollar of remuneration speaks volumes for their patriotism and fidelity to duty. Had they for one night refused to perform their duty, on account of the default in paying their salaries, one is appalled at the carnival of crime which would have resulted in our great metropolis. The reasons for withholding from these officers their hard earned salaries ought to be of the weightiest character, and not mere techinal objections.

We have endeavored to meet all the objections urged by the learned city counselor to the Act of March 15th. In our opinion it is a valid and constitutional law of this State, and as such is entitled to cheerful obedience by all persons and especially all officers, state and municipal.

Under its provisions it was the ministerial duty of the city auditor to audit the account and pay-rolls certified to him by the Board of Police Commissioners and draw his warrant as the law directs, on the city treasury, and to that end it is ordered that a peremptory writ of mandamus issue as prayed, and that relators have and recover their costs in this behalf expended. *Burgess, Robinson, Brace* and *Valliant, JJ.,* concur; *Marshall, J.,* concurring specially; *Sherwood, J.,* absent.

## SEPARATE OPINION.

MARSHALL, J.—I agree to the opinion herein, except as follows:

1. I do not think there is any question of taxation involved in the case. The State has power to require the city to pay the expense of the police department out of any money it may have from whatever source derived, because it confers the right to exist upon the city and therefore the right to raise or acquire money by taxation or otherwise, and hence the

State has the power to direct the purposes to which such money shall be applied or appropriated and the order in which such money shall be appropriated, even to require it to be appropriated first, before any other matters are provided for.

2. I do not think the Act of 1899 makes or was intended to make an appropriation, *ipso facto*, to meet the requirements of the Act. On the contrary, section 13 thereof requires the board of Election Commissioners to make an annual *estimate* of the amount necessary to run the police, and to certify it to the Common Council, and the *council* is then required to make the appropriation. Thereafter the board is required to certify all claims to the auditor who is then and not till then required to audit them. Thus clearly negativing the idea that the Act itself intended to make such an appropriation, or that the auditor could be required to violate his duty under the charter and audit a claim until there was a specific appropriation to meet it. The utmost that can be said of the appropriation made by the city for the support of the police in the general appropriation bill, is that it is a partial compliance with its duty under the Act of 1899. So regarded, there was a specific appropriation sufficient to authorize the auditor to draw his warrant to pay the claims certified by the relators and involved in this proceeding.