ALBERT PETERSON v. CHICAGO & ALTON RAILWAY COMPANY, Appellant.

Division One, June 30, 1915.

1. **NEGLIGENCE: Collision Between Street Car and Railroad Car: Prima-facie Case.** Evidence that plaintiff, a motorman in charge of a street car about to cross defendant's railroad tracks laid in the streets, was engaged in the performance of his duty to the street railway company; that defendant railroad company, through its servants, carelessly "kicked" a freight car across said street at a rate of speed of from ten to fifteen miles per hour, with no one in charge thereof, in violation of a city ordinance; that said freight car collided with said street car, and in consequence thereof the plaintiff was injured, makes out a prima-facie case for plaintiff and requires the court to submit the case to the jury by proper instructions.

2. ——: ——: ——: **Contributory Negligence.** Contributory negligence, as a rule, is a matter of defense, which must be pleaded and proven by the defendant. When plaintiff makes out a prima-facie case, entitling him to go to the jury, the burden then shifts to defendant, if he relies upon plaintiff's negligence, to disprove and overcome that case, to the satisfaction of the jury. And the prima-facie case for plaintiff having been made out, the case can never be peremptorily taken from the jury; for, however strong the countervailing testimony of plaintiff's contributory negligence may be, its credibility and weight are for the jury.

3. **CITY CHARTERS: Subject to State Laws: Emphasis from Repeating Words.** The words at the beginning of section 16 of article 9 of the Constitution declaring that a freeholders' charter of cities having one hundred thousand inhabitants or more shall be "consistent with and subject to the Constitution and laws of this State" are pointedly emphasized by their repetition at the close of the section.

4. ——: **Enabling Statute Applicable to One City: Conflicting With General Statute.** Special statutes found in the Enabling Act authorizing Kansas City to frame and adopt her own

charter and giving her exclusive control of her streets, are invalid and unconstitutional if in conflict with general statutes applicable to the whole State. In such case, the real point is, Is the general statute applicable to Kansas City? If so, then the next inquiry is, Do the general and special statutes contemplate the same subject-matter?

5. ————: **Consistent With General Laws: Applicable to What Matters.** The provisions of section 16 of article 9 of the Constitution, authorizing a city of one hundred thousand inhabitants or more to frame and adopt a special freeholders' charter and declaring it "shall always be in harmony with and subject to the Constitution and laws of the State," strike down no charter provision regulating a matter of peculiar municipal concern, even though in conflict with a general statute; but they do render invalid any charter regulation or any special statute applicable alone to such city, if in conflict with a general statute applicable to the whole State, where the subject-matter of legislation is one in which the whole people of the State are concerned.

6. ————: **Street Cars: Crossing Railroad Tracks: Stopping and Looking for Train.** Section 3303, Revised Statutes 1909, requiring every street railway company operating its street cars across the tracks of a railroad company, to bring its cars to a full stop at least ten and not more than twenty feet before reaching the tracks of the railroad company, and making it the duty of the conductor, or some other employee of the railway company, to go forward to the tracks of such railroad company for the purpose of ascertaining whether a train is approaching such crossing, is legislation upon a matter in which all the people of the State are concerned, and not a matter of peculiar municipal regulation; and said statute is not any the less applicable to Kansas City because the Constitution authorized that city to frame and adopt its own charter and the Enabling Act (Secs. 9752 and 9753, R. S. 1909) gave to such city "exclusive control" over its public streets and power to regulate the exercise by any corporation of any public franchise or privilege in any of its streets. The statute is in the interest of the traveling public, and was enacted for the public safety, and does not interfere with the city's control over its streets. [Disapproving Wills v. Atchison, Topeka & Santa Fe Ry. Co., 133 Mo. App. l. c. 634; and State v. Kessels, 120 Mo. 233.]

7. ————: ————: ————: **Police Regulation in Cities.** The State still retains its general police power over the entire State, including those cities which by permission of the Constitution are authorized to frame and adopt charters for their own municipal government; and that general police power includes the regulation of the movement within such cities of trains of railroads entering them upon which are carried, not only the citizens of such cities, but the public in general.

8. ———: ———: ———: **Exclusive Right of City.** The statutes giving Kansas City "exclusive control" over her public streets and the exercise by a corporation of a franchise or privilege in such streets are not void, when rightly understood; but they are to be understood as subject to and supplementary of other statutes which are an expression of the general police powers of the State.

9. **NEGLIGENCE: Street Car Crossing Railroad Tracks: Sec. 3303, R. S. 1900: Violation Not Cause of Accident.** Admitting that section 3303, Revised Statutes 1909, applies to motormen (which is questionable), yet where the motorman of the street car stopped his street car at the first railroad track crossing the street and moved forward when defendant's flagman signalled him to do so, the failure of the conductor to go forward to the railroad tracks for the purpose of ascertaining whether a train was approaching said crossing, is no defense to an action for damages by the motorman for injuries received in a collision with a freight car suddenly "kicked" back upon the crossing by the railroad company, if there was no causal relation between such failure and the injury to the motorman. And the evidence abundantly showing, if believed by the jury, that the conductor's failure to go forward was not the cause of the collision or the consequent injuries to the motorman, the failure to observe the requirements of the statute does not bar a recovery.

Appeal from Jackson Circuit Court.—*Hon. James E. Goodrich*, Judge.

AFFIRMED.

*Scarritt, Scarritt, Jones & Miller* for appellant.

(1) That Kansas City is inhibited by the State Constitution from abrogating or departing from any general statute passed by virtue of the general police power of the State, is settled by several decisions of the Supreme Court. State ex rel. v. Telephone Co., 189 Mo. 83; State ex rel. v. Yates, 190 Mo. 540; St. Louis v. Meyer, 185 Mo. 583; Ewing v. Hoblitzelle, 85 Mo. 64; St. Louis v. Williams, 235 Mo. 503. Inasmuch as plaintiff admitted that he had acted in violation of such Sec. 1180, R. S. 1899, the trial court erred in refusing to hold that plaintiff was guilty of negligence

*per se* and, therefore, erred in overruling defendant's demurrer to the evidence. (2) Defendant's demurrer to the evidence should have been sustained because plaintiff was clearly guilty of contributory negligence outside of Sec. 1180, R. S. 1899, and this for several reasons: (a). Plaintiff was guilty of negligence in failing to observe and obey the stop signal given to him by the watchman at the crossing very shortly after the watchman had given to him the signal to go forward. (b) Plaintiff was guilty of contributory negligence in that instead of making a determined effort to stop his street car after he saw the moving coal car with which he collided, he put on full power and deliberately ran his street car in front of the approaching coal car. (c) Finally, plaintiff was negligent because under all the evidence he saw, or clearly could, by the exercise of ordinary care, have seen, the approaching coal car in ample time to have stopped the street car and avoided the collision.

*Cook & Gossett* for respondent.

(1) There is no constitutional question involved in this case. Wills v. Railroad, 133 Mo. App. 625. This case was certified to the Supreme Court on the same proposition as that involved in the case at bar and the Supreme Court sent the case back, holding that no constitutional question was involved. No opinion of the Supreme Court is filed with its mandate retransmitting the case, but from the briefs of counsel it appears that an alleged constitutional question was raised. Kirkwood v. Meramec Co., 160 Mo. 111; State v. McKee, 196 Mo. 106; Petring v. Current River Co., 111 Mo. App. 373; Clark v. Porter, 162 Mo. 516; Hilgert v. Barber Co., 173 Mo. 319. (2) Secs. 9752 and 9753, R. S. 1909, give Kansas City exclusive control of its streets and the regulation thereof

and supersede Sec. 3303, R. S. 1909 (Sec. 1180, R. S. 1899). Wills v. Railroad, 133 Mo. App. 625; Kerney v. Asphalt Co., 86 Mo. App. 573; State v. Kessels, 120 Mo. App. 233.

WOODSON, J.—This suit was instituted in the circuit court of Jackson county by the plaintiff to recover the sum of $1999.99, from the defendant, as damages alleged to be due him for personal injuries sustained through its negligence in the operation of one of its freight cars, while passing over one of the public streets of Kansas City.

The plaintiff recovered judgment for the sum of $1250, and the defendant duly appealed the cause to the Kansas City Court of Appeals.

Because of certain constitutional questions involved that court transferred the cause to this court for determination.

The pleadings are not challenged in any particular, consequently we will pass them with the observation that they were sufficiently comprehensive to cover all of the propositions presented to this court for adjudication.

The facts of the case are fairly outlined in the statement of the case made by counsel for the plaintiff, which we will largely follow in the preparation of the statement of the case.

The plaintiff in substance testified: That at the time of the injuries complained of he was about thirty-five years of age. That at the time of his injuries, which was August 17, 1904, he was a motorman, and with the conductor was in charge of and was operating one of the cars of the Metropolitan Street Railway Company of Kansas City. That he was injured in consequence of a collision which occurred between said street car and one of the defendant's freight cars, at or near the intersection of First Street with Lydia Avenue, Kansas City, Missouri.

Up to and prior to that time the plaintiff had been a motorman and operating a street car upon and along said avenue for a period of some seven years.

Lydia Avenue runs north and south, and First Street east and west. The latter street, at the point of collision, had sixteen railroad tracks laid therein, and in the former there was located a double street-railway track. That intersection was known as the "Sixteen-Track Crossing."

The street railway tracks run north and south and the railroad tracks run east and west.

That at the time of the injury the plaintiff was going north on Lydia Avenue and when his car reached the south side of said crossing he brought it to a full stop and remained standing a sufficient length of time to allow two or three passengers to alight therefrom. That thereafter the conductor closed the gate of the street car and thereupon the plaintiff called for a signal from the flagman, an employee of the defendant, stationed at said crossing, and received from him a signal that the way was clear and for him to proceed across the intersection.

On the east side of Lydia Avenue there was a board sidewalk about four feet in width, the whole avenue being about fifty feet wide. The street railway tracks were approximately laid in the center of the avenue and the rails of each track were about four feet and eight inches apart, and the tracks were separated by the same distance.

The railroad tracks were also separated by the same distance that the street car tracks were, and the rails thereof were equally far apart.

That on the west side of Lydia Avenue, from the south track of the defendant company up to the next track south of the one where the collision occurred, numerous railway cars were standing on the tracks close to the west edge of Lydia Avenue, some of which were box cars. They so obstructed the plaintiff's view

that the first he saw of the defendant's car, the one with which his car collided, was the drawhead thereof emerging from behind the stationary freight cars before mentioned.

The car of defendant, with which plaintiff collided, was what was called a "kicked car," that is, one so violently shunted that its own momentum would propel it to the desired destination across the street, without the assistance of an engine or other power. This car was running about ten or twelve miles per hour, in violation of a speed ordinance of the city, and without any one being upon or in charge of it. At that time the street car was moving at about four to six miles per hour, and was only six or eight feet from the defendant's car when the plaintiff first discovered it. At that particular moment the street car did not have its power turned on, but was "floating across" the street, as stated by the witness.

Upon seeing the approach of the defendant's car, the plaintiff grabbed his brake, first intending to stop the street car, and seeing that could not be successfully done, because it could not have been stopped under twenty feet, he then turned on all power with a view, not of crossing in front of the "kicked car," but of hitting it with such force as to knock it from the track, and thereby prevent it from hitting, overturning and smashing the street car, in which there were several passengers. Owing to a miscalculation of the speed the street car would obtain under full power, a few feet of the front end of the street car passed in front of the front end of the kicked car, and the impact thereof derailed both cars, and turned the street car alongside of the freight car, and greatly injured the plaintiff, who was standing in the vestibule of the street car.

The flagman's shanty or watch house was about sixty feet north of the track upon which the collision occurred. The flagman was at his post of duty, and

there was nothing to obstruct his view of the approaching street car.

The plaintiff heard no bell or whistle warning him of the approach of the defendant's car, nor saw any signal of any kind except the one of the flagman inviting him to proceed across the street.

That from the point where the plaintiff first stopped the car south of the crossing to the point of the collision was about sixty feet, and the entire crossing was about one hundred and fifty feet wide.

The collision occurred on track No. 3 or No. 3½, the fifth or sixth track from the south.

That some of the plaintiff's teeth were knocked out, some of his ribs broken, one leg seriously injured and he received many more external and internal injuries.

He had always been in good health prior to the injury and weighed one hundred and sixty-two pounds; but since then he had never been well or regained his strength and had fallen off thirty-four pounds.

That at the time of his injury he was earning about $70 to $75 per month, but since the injury he had not been able to put in full time.

Morris Sharp, witness for plaintiff, testified that he was a passenger on a south or westbound car which reached the south side of the crossing and stopped there at the same time that the car on which plaintiff was. motorman stopped at the same place, and while the car on which witness was was still standing at this place, the watchman gave the plaintiff a signal and after the plaintiff's car was started and going across the crossing, the witness saw the defendant's car shoot out from the west side of Lydia Avenue and strike plaintiff's car. He could not see the defendant's car until it came into Lydia Avenue because of other cars standing along on the west side of Lydia Avenue and obstructing this witness's view to the north. He did not see or hear any one give a signal

from the time plaintiff's car started across the tracks up to the time of the collision. The defendant's cars on coming into Lydia Avenue were going so fast that the witness in his opinion could not run and keep up with them. The street car was, the witness thought, in about ten feet of the track on which the collision occurred when he first saw the defendant's car come into Lydia Avenue. Witness was fifty or sixty feet from the point of collision looking north along Lydia Avenue towards it.

Fred Brown, witness for the plaintiff, testified that he was on a track north of the one on which the collision occurred about one hundred yards west of Lydia Avenue at the time of the collision; that he immediately went down to the place of collision and noticed several strings of cars standing along the west side of Lydia Avenue.

P. H. Neyhart, witness for the plaintiff, testified that he was a passenger on the car of which plaintiff was motorman at the time of the collision, was a clerk at Heim's brewery; that he was sitting on the second or third rear lefthand seat; was reading a newspaper. He looked out the window when the car stopped preparatory to going across, and after doing so started to read his paper again. The next he noticed was that the defendant's cars were approaching the track on which was the street car. They were so close that he saw there was bound to be a collision. He noticed cars standing up close to the west side of Lydia Avenue on the tracks intervening between the south side of the crossing and the track on which the collision occurred. The collision happened within probably seven or eight seconds after he first saw the defendant's cars. The other cars along the west side of Lydia Avenue were so close to the west side of Lydia that he could not see the defendant's cars at an earlier moment; that the defendant's cars were going, in his judgment when he first saw them, about fifteen miles

an hour; that when he first saw the defendant's cars, in his judgment they were not more than forty feet away, and the car on which he was riding was from twenty to twenty-four feet long, and he was in the rear part of it; that if he had looked earlier he could not have seen the defendant's cars until they were within approximately six feet of the west side of Lydia Avenue; that the cars on the west side of Lydia Avenue stood about that distance.

William L. Cooper, witness for the plaintiff, testified that he was a passenger on the street car at the time of the collision. He was on the front seat of the west side; that the car stopped on the south side of the crossing as usual; that the motorman rang his bell, and the flagman gave him the signal to come ahead; that the witness had been traveling over that crossing daily for three of four years; that Lydia Avenue is one of the main thoroughfares from up town to the East Bottoms; that the street car had gone three or four car-lengths when the witness heard the sound of a locomotive whistle. He looked up and saw there was going to be a collision; that the defendant's front car was a coal car cut off from the rest of the cars and was being "kicked" across Lydia Avenue after being cut off from the engine; that the motorman tried to stop when he saw the car coming, then there was a sudden jerk of the car and it went ahead; that from the time he first saw the defendants cars to the time of the collision scarcely any time elapsed, "less time than it takes to tell it, instantly almost." This witness had been a foreman with a cattle-car company and formerly with the Santa Fe Railroad; that the defendant's coal car was going about eight miles an hour. The result of the collision was that the coal car was derailed and turned diagonally to the north and east. The street car was turned east parallel to the railroad track. The front wheel or wheels of the street car were broken. The street car was knocked or thrown

about twenty feet and the whole of the coal car was off the track. The street car was struck by the coal car about the front truck under the first or second seat. The witness saw freight cars standing on the other tracks along the west side of Lydia Avenue, close to it, and south of the track on which the collision occurred. He was not sure whether they were on the tracks immediately adjacent to the one on which the collision occurred, but his best recollection was that such cars were on the track immediately south of the place of collision. The rate of speed of the street car was four or five miles an hour; that he knew defendant's witness, Garlock, foreman of the switching crew which was moving these cars of the defendant which were in collision; that immediately after the collision within a minute or two Garlock came from where the engine was west of Lydia Avenue down to the place of collision; that the witness had heard the engine give two or three or four quick puffs, which was its action in "kicking" the coal car across Lydia Avenue; that immediately before the collision, while the street car was moving on the crossing and had gone two or three lengths, he saw the defendant's switchman on the west side of Lydia Avenue give the signal to "kick" the car across; that immediately after he heard the engine whistle and saw the switchman give the signal to "kick" the car over, he felt a jar of the street car as if the motorman had tried to reverse his power or shut it off and applied the brake, and then immediately afterwards the street car went forward and the collision occurred; that the street car before that was going about four miles an hour; that when he saw the defendant's car coming into Lydia Avenue, he immediately got up and ran towards the rear of the street car to get out; that he had not reached the rear end when the collision occurred; that the collision occurred within five or six seconds after he first saw the defendant's car.

Joseph Markel, witness for the plaintiff, testified, that on August 17, 1904, he was the flagman at this Lydia Avenue crossing; that the entire crossing from the south railroad track to the north is about two hundred feet; that Lydia Avenue is about fifty or sixty feet wide; that he flagged everything, all trains, cars and wagons that attempted to cross; that there are sixteen steam railroad tracks in the crossing and the Metropolitan has a double track on Lydia Avenue; that he saw the plaintiff and the street car on the south side of the crossing where they had stopped preparatory to coming across, and that he, the plaintiff, rang for the flagman to signal him about the crossing; that the witness gave the signal to come across; that the crossing was then clear; that after the plaintiff's car got started on the way over the crossing, the witness noticed defendant's switchman run out and give a signal to cut off the defendant's car and "kick" it across; that the witness then ran out and tried to stop the plaintiff and gave him a signal to stop; that he had not given the defendant's crew any signal to come across; that none of the defendant's train crew were out on Lydia Avenue; that the collision occurred on track 3 or 3½, he was not certain which; that his recollection was that there were no cars close to the west line of Lydia Avenue on the track next south of the one on which the collision occurred, but that on the other tracks on the west side of Lydia Avenue south of where the collision occurred there were various cars, some of them close to the west line of Lydia Avenue and some not; that when he saw the switchman giving the signal to "kick" the car across he, the switchman, was at or near the west line of Lydia Avenue; that the crew had taken the engine and some cars across Lydia Avenue from east to west about five minutes before. They had then asked for a signal and he, the witness, had given them the signal to go across to the west, but that neither the switchman nor any

one else of the defendant's crew had asked him for a signal to go back east, and that the switchman had given his signal to his train crew to "kick" defendant's car across from the west to east without any signal whatsoever from the flagman; that the defendant's train consisted of an engine and three cars, the front one of which hit the street car, and that it was cut off and "kicked" across the crossing by uncoupling it and giving it a push with the engine and then stopping the engine and letting the car go on of its own momentum; that there was no one on this "kicked" car or in charge of it after it was started across; that it was the practice and custom for the street cars to stop before making the crossing to get the signal for a clear crossing, and the same way for the defendant's train crews engaged in switching about the yard; that in his judgment the "kicked" car was going about five or six miles an hour and struck the street car two or three feet back of the vestibule, knocking it around sideways with the coal car; that between ten o'clock and noon of the day of the collision, a photographer was on the ground, taking photographs; that he did not see any other photographer there that day than this one and that between the time of the collision and the time the photographer was there, more or less switching was going on of cars in the yard at that place; that the defendant kept two or three switch cars in the yard and that it was a very busy yard; that all of the sixteen tracks belong to the C. & A. Railroad, except the north one, which was the Missouri Pacific track; that the collision occurred on track either 3 or 3½, probably the sixth track from the south; that the collision occurred about half way between the flagman's shanty and the south side of the crossing, and that the distance from the shanty to the place of the collision was seventy-five or eighty feet; that he was standing out in the street and a little south of the shanty when he signaled the plaintiff to come

across with the street car; that he did not watch the street car coming across all the time; that the tracks on the West side of Lydia Avenue from the place of collision south to the south side of the crossing was full of cars at the time of the collision; that he had permitted a street car to go south just before he signalled the plaintiff to bring his car across to the north; that the coal car which was "kicked" across the street by the defendant was standing on the track at the west edge of Lydia Avenue when he let the street car go south; that he could see about four feet of it around some cars that were standing on the track north of that track on which this coal car was standing; that he could not see the engine, only the smoke of it; that after he saw the "kicked" car coming across the street he gave the signal to the street car to stop and that after he gave that signal the defendant's foreman, Garlock, likewise gave a signal for the street car to stop; that the coal car which was "kicked" across was right up close to the west line of Lydia Avenue; that it was hard to tell how far the street car had come on to the crossing, and that when the "kicked" car came into the street "it just shot right out . . . into the car;" that it came across a second after Garlock gave a signal; that Garlock gave no signal before he, Garlock, gave the signal for the car to be "kicked" across; that the track on which the collision occurred is three or four feet from the next track south, or space enough to leave two or three feet between the cars standing on each track, and that there was a box car standing close to the west line of Lydia Avenue on the second track south of the one on which the collision occurred; that there was about the same distance between this track and the one next north of it as between such track and the one on which the collision occurred; that this box car was high above the track, with a big body.

Plaintiff then introduced stipulation to the effect that the defendant was operating the railroad and that

its switching crew was in charge of the engine and cars, one of which is alleged to have struck the street car, and that such engine and cars belong to the defendant and were being operated by it, and that Lydia Avenue at the place where the collision occurred was a public street in Kansas City, Missouri, at the time.

W. M. Corbett, defendant's superintendent, testified that the defendant had no printed instructions or rules relative to the crossing of trains across this crossing; that they had no instructions for flagmen at such crossings; but that the flagman would protect crossings by signals which were to the train men when to come across and when not to come across and the same to others; that his idea was when they wanted to "kick" a coal car across the public crossing like this, he supposed the train crew would ring a bell and whistle in the ordinary way.

Albert Peterson, recalled, testified that he had been accustomed for several years to going over this crossing twelve times a day, six times each way, and that it had been the practice and custom for the switching crews to call for a signal before attempting to go across Lydia Avenue; that some times there would be a man ahead of the train and at other times not, and at such times when there was no one ahead of the train they would whistle for the crossing.

A. K. Chalmers, conductor on the street car, as a witness for plaintiff testified that he was such conductor on the street car involved in the collision; that the car was stopped on the south side of the crossing and that it did not undertake to go across until the flagman gave the signal for it to come across; that he saw the defendant's car approaching the track on which the street car was moving north and they were very near together when he first saw them; that the force of the collision forced the street car across the east sidewalk of Lydia Avenue, the rear end of the car being left about on the sidewalk and the east end of the coal car

was even with the west end of the street car; that the
coal car was moving at about twelve miles an hour;
that the street car was moving about seven or eight
miles an hour; and that it was only a few seconds af-
ter he saw the coal car that the collision occurred;
that no one was upon the coal car at the time he first
saw it; that there was a box car which appeared to him
to be upon the track immediately south of the one on
which the collision occurred close to the west edge of
Lydia Avenue, and a track or two south of that were
other cars loaded with telephone poles; that after the
coal car stopped he observed that it was not attached
to the engine; that his recollection was that the colli-
sion occurred on the fifth track, counting from the
south side of the crossing; that when he first saw the
coal car, the rear end of the street car where the wit-
ness was was then within forty feet of the coal car
when he saw it coming west on Lydia Avenue; that
when he first saw them he could only see the front
coal car which struck the street car.

Plaintiff, recalled for further cross-examination,
testified that when he first saw the drawhead of the
coal car coming out from behind the other cars stand-
ing along the west side of Lydia Avenue this coal car
was then twenty or twenty-five feet west of the street
car track on which the street car was going north; that
there was a red box car on the track south and two flat
cars loaded with telephone poles which obstructed his
view so that he could not see this coal car until it came
out into the west side of Lydia Avenue; that there was
nothing to attract his attention to this coal car until
it began to move; that when he first saw this coal car
begin to move, he was on the track south of the track
which it was on; that the flagman's shanty was about
eight feet square, with a porch extending to the side-
walk on the east side of Lydia Avenue.

The plaintiff introduced some other testimony to
the same effect as that stated, but that stated is suffi-

cient to show the character of the plaintiff's case, and for that reason no good purpose would be served to state more of it.

Here the plaintiff rested his case; and thereupon the defendant offered a demurrer thereto, which was by the court overruled, and exceptions were duly saved.

The defendant then introduced much evidence tending to contradict that of the plaintiff; also tending to show contributory negligence on his part, as well as that the signal mentioned by plaintiff and some of his witnesses notifying the plaintiff to proceed across the street, was given to and intended for the agents and servants of the defendant in charge of the cars which collided with and injured the plaintiff, and that in pursuance of that signal said car was shunted across the street, and that in passing over the street it collided with the street car upon which the plaintiff was operating and injured him.

That prior to the collision defendant's agents in charge of the cars in question and the flagman also gave the plaintiff a signal to stop his car in order to avoid the collision, which was not obeyed. The plaintiff testified that he did not see or hear it.

That within an hour or so after the injury occurred, and before there had been any material change made of the positions of the cars that were there present at the time of the collision, the photographs thereof introduced in evidence were taken, and that they correctly presented a picture of the cars, tracks and other physical conditions as they existed at the time of the collision.

I. There are but four legal propositions presented by this record for determination by this court.

The first is, independent of the question of contributory negligence, did the evidence introduced by

**Prima-Facie Case.** plaintiff make out a prima-facie case for him?

We have, with much care, set out the substance of the evidence introduced by the plaintiff, for the express purpose of meeting this proposition.

After a careful reading of the same it will be clearly seen that it tends to prove each and every element that is required to be established in order to make out plaintiff's case.

It tended to show that the plaintiff was rightfully upon one of the public streets of Kansas City, engaged in the performance of his duty to the street railway company; that the defendant, through its agents and servants, carelessly shunted a freight car across First Street, a public thoroughfare, at a rate of speed from ten to fifteen miles an hour with no one in charge thereof, in violation of a city ordinance, which collided with the car which the plaintiff was operating; and that in consequence thereof he was seriously injured.

Those were the three matters the law required the plaintiff to prove, and clearly the evidence he introduced tended to prove each and all of them. That being true, a prima-facie case was made and it became the duty of the court to submit it to the jury by proper instructions; and consequently the court properly overruled the demurrer to the evidence.

II. The second proposition presented is: Was the plaintiff under the facts disclosed by the evidence guilty of such contributory negligence **Contributory Negligence.** that the court should have declared, as a matter of law, that he could not recover?

The question of contributory negligence, as a rule, is a matter of defense which must be pleaded and proven by the defendant.

As held in paragraph one of this opinion, the plaintiff having made out a prima-facie case, then according to the rule just announced the burden rested upon the defendant to disprove and overcome that case, to

the satisfaction of the jury. That, of course, means that the jury and not the court must pass upon the credibility of the witnesses and the weight to be given to their testimony. That is, after a prima-facie case has once been made out, the case can never be taken from the jury. [Boone v. Railroad, 20 Mo. App. 232; Kenney v. Railway, 80 Mo. 573; Gregory v. Chambers, 78 Mo. l. c. 298-9; Cannon v. Moore, 17 Mo. App. l. c. 102; Gibson v. Zimmerman, 27 Mo. App. 90; Milliken v. Comm. Co., 202 Mo. 637; Rinehart v. Railway, 204 Mo. l. c. 276; Vincent v. Means, 184 Mo. l. c. 340-341; Bryan v. Wear, 4 Mo. 106; Vaulx v. Campbell, 8 Mo. 224; Wolff v. Campbell, 110 Mo. 114; Randle v. Railway, 65 Mo. l. c. 334; McAfee v. Ryan, 11 Mo. 364; Steamboat City of Memphis v. Matthews, 28 Mo. 248; Bradford v. Rudolph, 45 Mo. 426; Wood v. Railway, 181 Mo. l. c. 445; Hipsley v. Railway, 88 Mo. l. c. 352; Meyers v. Trust Co., 82 Mo. l. c. 240; Dalton v. Poplar Bluff, 173 Mo. l. c. 47; Mineral Land Co. v. Ross, 135 Mo. 101; Huston v. Tyler, 140 Mo. 252; Gordon v. Burris, 141 Mo. 602; Cornwell v. Wulff, 148 Mo. 542; Seehorn v. Bank, 148 Mo. l. c. 265; Weinberg v. Street Ry. Co., 139 Mo. l. c. 290; Seawell v. Railroad, 119 Mo. 222; Schroeder v. Railroad, 108 Mo. 322; Seligman v. Rogers, 113 Mo. l. c. 649.]

III.    This brings us to the consideration of the third, the most important proposition presented; namely, that the plaintiff cannot recover in this case for the reason that at the time he was injured he was violating section 1180, Revised Statutes 1899, now section 3303, Revised Statutes 1909.

**Exclusive Control of Streets: Matters of Municipal and State Concern: Statutes.**

Counsel for defendant present their contention in the following language:

"The following undisputed facts appear in the evidence in this case: That plaintiff was a street car

·motorman and was acting as such and was in charge of and operating a car of the Metropolitan Street Railway Company at the time of the accident in question, and that at such time said street railway car was being run across the tracks of defendant railroad company, and that neither plaintiff, his conductor nor any other employee of said street railway company went forward to the track of such railroad company for the purpose of ascertaining whether a train was approaching such crossing, before plaintiff ran his car upon the railroad tracks, as required by section 3303, Revised Statutes 1909 (Sec. 1180, R. S. 1899). Said section 3303, Revised Statutes 1909, is as follows:

" 'It shall be the duty of every street railway company or corporation operating a street railway across the tracks of a railroad company to bring its cars to a full stop at least ten or not more than twenty feet before reaching the tracks of the railroad company. And it shall be the duty of the conductor, or some other employee of the street railway company, to go forward to the tracks of such railroad company for the purpose of ascertaining whether a train is approaching such crossing.'

"Plaintiff testified as follows:

"Q. Did you get off of the car at any time before you crossed the track? A. No, sir.

"Q. You stood right there at your controller all the time? A. Yes, sir.

"Q. Did the conductor get off of your car and go forward? A. No, sir.

"Q. He stayed on the rear part of the car all the time? A. Yes, sir.

"Q. Did anybody else in the employ or in connection with the Metropolitan get off and go across the tracks? A. No, sir."

The proposition here presented does not involve the meaning and effect of this statute so much as it

does its application to this case; but after disposing of this question we will briefly consider its meaning.

Counsel for defendant contend that since it is conceded that the injury complained of was inflicted upon the plaintiff while he was operating a street railway car across the tracks of a railroad company he cannot recover because neither he, the conductor nor any other employee of the street railway company stopped said car before reaching the tracks of the railroad company, alighted therefrom and went forward to the tracks of such railroad company for the purpose of ascertaining whether or not a train was approaching such crossing.

In reply to that contention counsel for the plaintiff insist that sections 6408 and 6409, Revised Statutes 1899, now sections 9752 and 9753, Revised Statutes 1909, give Kansas City the exclusive control over its streets as well as the regulations thereof, which supersede and nullify said section 1180, now section 3303, heretofore mentioned.

The two former statutes are a part of the Enabling Act, originally enacted in 1887 (Laws 1887, pp. 42 to 51), same as sections 1840 to 1891, Revised Statutes 1889, authorizing cities having a population of one hundred thousand inhabitants or more to adopt special charters, as provided for by section 16 of article 9 of the Constitution of 1875.

Those statutes have been brought forward, unchanged, into all of the revisions of the statutes since that time.

The two sections referred to read as follows:

"Such city shall have exclusive control over its public highways, streets, avenues, alleys and public places, and shall have exclusive power, by ordinance, to vacate or abandon any public highway, street, avenue, alley or public place, or part thereof, any law of this State to the contrary notwithstanding.

"It shall be lawful for any such city in such charter, or by amendment thereof, to provide for regulating and controlling the exercise by any person or corporation of any public franchise or privilege in any of the streets or public places of such city, whether such franchises or privileges have been granted by said city, or by or under the State of Missouri, or any other authority."

These statutes are made to apply only to cities with a population of one hundred thousand inhabitants or over; and in my opinion only to those which have adopted a special charter under said section 16 of article 9 of the Constitution or section 23 of same article, which is expressly limited to the city of St. Louis, both of which will be considered presently.

(But in this case whether they apply to cities having a population of 100,000 or more which have not adopted a special charter, is wholly immaterial, for Kansas City has adopted a special charter.)

In reply to this insistence counsel for defendant contend that if said section 3303, a general statute, is superseded and nullified by said sections 9752 and 9753, then both are violative of section 16 of article 9 of the Constitution of Missouri of 1875, which briefly provides, among other things, that any city having a population of one hundred thousand or more may frame and adopt a special charter governing the same, which shall be consistent with and subject to the Constitution and laws of the State.

Said section 16 of the Constitution reads as follows:

"Any city having a population of more than 100,000 inhabitants may frame a charter for its own government, consistent with and subject to the Constitution and laws of this State, by causing a board of thirteen freeholders who shall have been for at least five years qualified voters thereof, to be elected by the qualified voters of such city at any general or special

election; which board shall, within ninety days after such election, return to the chief magistrate of such city a draft of such charter signed by the members of such board or a majority of them. Within thirty days thereafter, such proposed charter shall be submitted to the qualified voters of such city, at a general or special election, and if four-sevenths of such qualified voters voting thereat shall ratify the same, it shall, at the end of thirty days thereafter, become the charter of such city, and supersede any existing charter and amendments thereof. A duplicate certificate shall be made, setting forth the charter proposed and its ratification, which shall be signed by the chief magistrate of such city and authenticated by its corporate seal. One of such certificates shall be deposited in the office of the Secretary of State, and the other, after being recorded in the office of the Recorder of Deeds for the county in which such city lies, shall be deposited among the archives of such city, and all courts shall take judicial notice thereof. Such charter, so adopted, may be amended by a proposal therefor, made by the lawmaking authorities of such city, published for at least thirty days in three newspapers of largest circulation in such city, one of which shall be a newspaper printed in the German language, and accepted by three-fifths of the qualified voters of such city, voting at a general or special election, and not otherwise; but such charter shall always be in harmony with and subject to the Constitution and laws of the State."

By reading said constitutional provision it will be observed that at the end thereof, it in substance repeats the provision before mentioned, found in the first part thereof. The last provision is in these words: "but such charter shall always be in harmony with and subject to the Constitution and laws of the State."

While this repetition of the constitutional limitation previously mentioned, making all such special

charters subject to the Constitution and laws of the
State, does not add any additional restrictions to those
stated in the first part of said section, yet it clearly em-
phasizes the desire and intention of the framers of the
Constitution that all such cities, like all others of the
State, should be *subject to the Constitution and laws*
of the State; otherwise, why did they begin said sec-
tion with that limitation and close it by restating the
same limitation?

With these constitutional and statutory quotations
and explanatory observations I will now return to the
question: Did said sections 9752 and 9753 supersede
and nullify said section 3303 in so far as Kansas City
is concerned?

Counsel for the plaintiff take the position that
said constitutional provisions took the power from the
Legislature to enact laws to control the streets and
highways of Kansas City, and delegated that exclusive
power and authority to the city. That being true, they
contend the Legislature never intended that section
3303 should apply to Kansas City, and that if it did
so, then it was unconstitutional and void.

In considering this question it should be borne in
mind that street cars are operated almost exclusively
in cities, and the larger they are the greater the neces-
sity for guarding the traveling public against injury
while crossing the tracks of steam railroads.

This direct question has never been decided by this
court, but its great importance to the traveling pub-
lic, by means of street and railway cars, as well as to
the street car and railway companies themselves, to
say nothing of that to cities of this class, demands a
higher degree of consideration than the briefs of coun-
sel indicate has been devoted to it.

No authority whatever has been cited by counsel
for plaintiff in support of the proposition here ad-
vanced by them.

It may be they were so confident that the case could and would be decided in their favor upon other grounds they thought it unnecessary to give this question the consideration its importance demands. Counsel for plaintiff brush aside this, the real constitutional question involved, in the following easy and pleasant manner:

"The Constitution provides that the ordinances of the city must be in accord with the Constitution and laws of the State. [Sec. 16, art. 9, Constitution.]

"Now, it does not require the decision of a constitutional question to determine whether or not the grant of exclusive control over its streets by Kansas City excludes the application of section 3303, formerly section 1180, or whether that section is applicable to Kansas City's streets where the city has assumed that control."

It may be conceded that it would not require the decision of a constitutional question to determine that the grant to Kansas City of exclusive control over its streets would exclude the application of said section 3303, to the streets thereof; but that is not the question here presented by counsel for defendant for adjudication. The question here is: Are sections 9752 and 9753, which purport, as counsel for plaintiff contend, to give that "exclusive control" of the streets to Kansas City, constitutional under section 16 of article 9 of that instrument? That question must be first decided before it can be determined that Kansas City has that *exclusive control.* If they are in conflict with said section 3303, and if it applies to Kansas City, as insisted by counsel for defendant, as well as all parts of the State, then clearly a constitutional question is involved for the obvious reason that in such case, said sections 9752 and 9753, which are conceded to be local in operation, would be in conflict with said section 3303, a general law, and violative of said section 16 of article 9 of the Constitution, which provides that all laws gov-

erning such cities "shall always be in harmony with and subject to the Constitution and laws *of the State.*"

To make myself clear: If section 3303 is a general law, which is conceded, and it is applicable to Kansas City, as contended, and inconsistent with said sections 9752 and 9753, then the latter two sections of the statute are unconstitutional; but whether or not in fact there is such a conflict must be hereafter determined.

So it is perfectly clear to me that the constitutional question is properly lodged here and must be disposed of.

The foregoing digression is due to the fact that counsel for plaintiff incidentally injected this phase of the constitutional question into the case at this point, and I deemed it best to dispose of it as I have at this point, as incidental to the main constitutional question presented, viz.; does section 3303 apply to Kansas City, and is it in conflict with sections 9752 and 9753?

Returning to the point of digression.

As there stated, counsel for the plaintiff have cited no authority in support of the position taken by them. However, I have found certain cases, cited by counsel in briefs filed in another case involving this same point, but not decided. Those cited in support of the position here taken by plaintiff are: Kansas City ex rel. v. Scarritt, 127 Mo. 642, l. c. 649; State ex rel. v. Telephone Co., 189 Mo. 83; Kansas City v. Oil Co., 140 Mo. l. c. 467; Merz v. Missouri Pac. Ry. Co., 88 Mo. 672; State ex rel. v. Field, 99 Mo. 352.

In the case of Merz v. Railroad, supra, an ordinance of the city of St. Louis regulating the speed of trains was under consideration, prohibiting the blocking of streets thereby. Defendant claimed the city had no authority to enact such an ordinance. In answer thereto, the court, on page 676, said:

"It is insisted that the mayor and assembly had no power to pass the ordinance. By article 3, section 26, subdivisions two, five and six, of the charter (2 R. S. p. 1585) express power is given to the city to regulate the use of all its streets, and to regulate all vehicles, business, trades and associations; to declare, abate and prevent nuisances on public and private property, from all which, to pass such an ordinance as the one in question may well be deduced and exercised. But aside from this, in the absence of any express authority, by reason of the general supervision over the police which the city has, the authority to pass the ordinance in question may well be derived.

"Mr. Dillon (2 Dill. on Mun. Corp., sec. 713) says: 'Resulting from the power over streets, and to protect the safety of citizens, and their property, municipal corporations, in the absence of legislative restriction, may control the propelling of cars within their limits, may prohibit the use of steam power, and regulate the rate of speed.' "

In that case the question before the court was, did the city have the power to enact the ordinance, and not the *exclusive* power? The question here prsented was not identical with the one involved there.

In State ex rel. Kansas City v. Field, 99 Mo. l. c. 355, this court said:

"Subject to this superior power of the Legislature the Constitution accords to any city having the requisite population the right to frame and adopt a charter for its own government, which will supply its peculiar wants. Charters thus adopted will, of necessity, be more or less at variance, and that they will be unlike in many respects, is within the contemplation of the Constitution. It is also within the fair contemplation of the Constitution that a charter thus adopted may embrace the entire subject of municipal government, and be a complete and consistent whole. The Enabling Act of March 10, 1887, is in perfect accord

with the spirit of the Constitution and it discloses a
well defined purpose to clear the legislative field, and
pave the way for the adoption of a charter which will,
of itself, present a complete system of local municipal
government. It says the charter thus adopted shall be
and constitute the entire organic law of such city.
Stronger language could hardly have been selected to
express the purpose and intention which we have said
is disclosed by this act.''

The Field case is quoted, approved and followed
in Kansas City v. Oil Co., 140 Mo. 1. c. 467. The latter
case was one where the city sought, under its charter
provisions, to condemn certain lands for park pur-
poses. Defendants denied that the city had any such
power, because the means employed in the charter
were different from those provided for by the general
laws of the State. The court, speaking through GANTT,
J., after calling attention to the constitutional pro-
vision authorizing the city to adopt a charter, and to
the Enabling Act, on page 467, said:

"Upon legal principles it cannot be seen what
efficacy there was in this legislative act. The power
with its limitations had been previously conferred by
the people of the State and it was not within the power
of the Legislature to curtail it. That the people of
Missouri in their sovereign capacity and by their or-
ganic law, could delegate to the people of a municipal-
ity this power to frame a charter for its own local
government, as to matters falling properly within
municipal regulation, we have no doubt whatever.
Such a right is entirely in accord with the genius of
our institutions, bringing the regulation and govern-
ment of local affairs within the observation of those
who are to be affected thereby, and at the same time
preventing the officious and selfish intermeddling with
the charters of our cities, without the knowledge of
those whose rights are affected. . . .

"The inquiry then is, whenever a charter so framed comes under judicial review, is it in harmony with and subject to the laws and Constitution of the State?

"It is to be observed in this connection that the permission to frame a charter necessarily carries the privilege of providing a system different from that adopted for the State at large, provided it shall not override or collide with the constitutional guarantees and restrictions, and shall not be out of harmony with the general laws of the State. It must be borne in mind that the grant of the right to frame a charter of its own would have been utterly without force and meaningless, if the convention which framed the Constitution and the people who adopted it meant that such a charter should be in all respects exactly like the general charters framed by the general statutes for the class to which it would have belonged but for that privilege. We are forbidden by the rules of fair construction to ascribe such a restricted meaning to words in so important a document as the Constitution of the State. . . .

"A charter is the organic law of a city in this State whether it emanate from the General Assembly, or is framed and adopted by the people of the municipality by authority of the Constitution. Being a law for the government of the municipality it is binding upon all courts, and it violates no principles of our government to say that the courts, when called upon, must enforce these municipal laws unless they conflict with the Constitution, and are not in harmony with the Constitution and laws, and, as already said, mere differences in details do not render such laws inharmonious. So long as Kansas City, under its special charter, does not invade the province of general legislation, or attempt to change the policy of the State as declared in her laws for the people at large, it will not be held to be out of harmony with such laws, notwithstanding the provisions of the special charter may be

different from the general statutes prescribed for the government of other cities in their local affairs.

. . .

"Fortunately we see no reason for doubting the correctness of State ex rel. Kansas City v. Field, 99 Mo. 352. We think it was properly ruled that the special charter superseded the general statutes where the two conflicted as to a mere muncipal regulation, and we hold that condemnation proceedings to acquire lands for streets, parks, waterworks, sewers and the like, clearly fall within municipal regulation."

In the case of Kansas City v. Bacon, 147 Mo. l. c. 272, the court said:

"The power to frame a special charter for itself would be meaningless and nugatory if the construction should obtain that its provisions must all be *in haec verba* with the provisions relating to the same subject in some other statute relating to cities in their class. 'Consistent with' does not import exact conformity, but means substantial harmony with the principles of the Constitution and the general laws of the State."

State ex rel. v. Telephone Co., 189 Mo. l. c. 102, is the case in which Kansas City sought to fix the rates to be charged by telephone companies. It was claimed for the city in that case that the sections of the Enabling Act gave the city the power to fix the rates, but this was denied by the Supreme Court. But in passing upon that question the court has this to say:

"In adopting these two sections, 50 and 51 [the same as 9752 and 9753] of the so-called Enabling Act, the Legislature had in view the necessity of the power in the city, to control its streets and other public places, and the power in the State to grant franchises to be exercised by the grantee in the streets and other public places of the city, and it was not difficult to foresee that a clash might occur between the city in its exclusive control of the street, and the private corporation in the exercise of the franchise granted by the

State. Therefore, after granting to the city, as it did in section 50, control of its streets, the thought occurred to the lawmakers that there were private corporations organized and to be organized under the laws of this State with express authority to use the streets and other public highways in the exercise of their franchises, and in order to prevent any clash that might occur between the city in its control of the streets, and the private corporation in its use of the same, section 51 was added, which gave the city power to regulate and control the private corporation in its use of the street. Under that power the city may regulate the planting of poles, wires, etc., or require the wires to be under ground, or do anything within reason to render the use of the street by the private corporation of as little injury to the public as may be.''

This identical question was passed upon by the Kansas City Court of Appeals, in the case of Wills v. Atchison, Topeka & Santa Fe Ry. Co., 133 Mo. App. l. c. 634, a case arising out of a similar collision. Judge BROADDUS in speaking for the court said:

''It is contended by the Santa Fe Company that its codefendant was under obligation to bring its car to a full stop, at least ten and not more than twenty feet before reaching the tracks in question, and that it was the duty of its conductor, or some other of its employees, to have gone forward to said tracks for the purpose of ascertaining whether a train was approaching said crossing, as provided by section 1180, R. S. 1899. We think not. Under what is known as the 'Enabling Act' Kansas City had exclusive control over its public streets, avenues, alleys and public places, and had exclusive power by ordinance to vacate or abandon any public highway, street, avenue, alley or public pace, or part thereof, 'any law of this State to the contrary notwithstanding.' This was a delegation to the city by the Legislature of the exclusive control of its streets. In Kerney v. Barber Asphalt Pav. Co., 86 Mo. App.

573, it was so held. In State of Missouri v. Kessels, 120 Mo. App. 233, a similar question was under consideration. The Legislature had granted the city of St. Joseph 'exclusive power to restrain, regulate, license, tax or suppress dramshops.' The .defendant was indicted, tried and convicted for a violation of the general law for keeping open his dramshop and selling intoxicating liquors therein on Sunday. This court held that he was not amenable under the general law, as exclusive power over the subject had been granted to the city. In that case the question was exhaustively argued and authorities reviewed, and in so far as this court is concerned, the question is settled. While such duty was not imposed by statute, a similar duty existed at common law, as has already been stated, namely, the exercise of the highest degree of care for the safety of passengers. The Metropolitan Company insists that as the case was tried upon the theory that said section regulated and prescribed its duties, it was greatly prejudiced thereby. It was the creation of a false issue. But we cannot see how it could have been prejudicial. It was not necessary to plaintiff's case. The Metropolitan most signally failed to show that it exercised that high degree of care that the law imposed upon it for the protection of its passengers. Although there was no ordinance in force requiring it to proceed with caution to cross the Belt Line tracks, the law, as we have seen, imposed that duty. Its principal attempt at exoneration was to show that the Santa Fe Company was guilty of negligence. But the failure of that company to use reasonable care was no justification for the Metropolitan's failure to exercise the highest degree of care. What might excuse the former would not necessary exculpate the latter.''

With due deference to the ability and great learning of the distinguished jurists who wrote that opinion and the opinion in the case of State v. Kessels, 120

Mo. App. 233, we are unable to lend our concurrence to the views and conclusions reached in those cases.

The view of the Kansas City charter as expressed by that court and endorsed by counsel for the Metropolitan seems to me to be too narrow. This statute is a regulation of the mode by which street car companies shall cause their cars to cross the tracks of steam railroads throughout the State, irrespective of whether they are in a city or the country, or in a street or outside of a street. This statute was enacted for the protection of the citizens of the State and for the traveling public generally, regardless of the place where such cars cross the tracks of steam railways. If we bear in mind the object the Legislature had in enacting the statute, viz.: guarding the safety of the traveling public; and should we then exempt from its operation the cities of St. Louis and Kansas City because of their special charters, it would by construction virtually become a dead letter, for then it would apply only to St. Joseph, Springfield, Joplin and Sedalia, which are about all of the remaining cities which have street railways, and need the protection of such a statute. In the latter cities its protection is not so large and is not needed nearly so much as it is in the former two. A million people or more reside in those two cities who are constantly crossing the tracks of steam railways in thousands of street cars; while in the other four probably not more than 250,000 reside, all told, and who do not ride so much in street cars, in proportion, as do those residing in the former, for the reason that street car travel is increased proportionately to the distances the residents of a city reside from the business center thereof. And in addition, there are many more steam railways in St. Louis and Kansas City then there are in said other cities, and, consequently, the number of street cars crossing the tracks of the various roads in those cities are just that many more numerous in those cities than they are in

said small cities.   Probably to make a rough estimate,
I would be safe in saying that there are more than
fifty times as many people who ride daily in street cars
in St. Louis and Kansas City than as travel by similar
means in said other four cities.   That being true, then
it is unreasonable to suppose the Legislature would
have enacted such a wise statute, and in the same
breath have limited its operation to those cities where
its protection is the least needed, and exclude it from
where it would do the most good—in fact, practically
all of it.   Besides that, if the Kansas City Court of
Appeals is correct in its conclusions reached in the case
of State v. Kessels, supra, then this section 3303, by
parity of reasoning, would not be operative in the city
of St. Joseph either, for the reason it alone is governed
by the charter of cities of the second class, which would
exclude therefrom the operation of this section of the
statute, just as that court held it excluded the opera-
tion of the general statute of the State governing the
issuance of dramshop licenses.   Both decisions are bot-
tomed upon precisely the same grounds.   The Wills
case is based upon the Kessels case, and they must
stand or fall together.   If that is true, then section 3303
would by construction become practically a dead letter,
as before stated.

But we are not required to rest our opinion in this
case upon reason alone.   We are well fortified and sup-
ported by numerous adjudications from this court,
which while not involving this precise question, yet in-
volved the same principles.

This enactment is an additional safeguard
thrown around the traveling public.   It requires this
safe mode of operating street cars at all points of in-
tersection with other railroads of the State.   This pro-
vision if enforced would afford almost perfect protec-
tion to the public safety and still not interfere with the
city's control over its streets.

It is said in 22 Am. & Eng. Ency. Law (2 Ed.), 924: "A well recognized function of the police power is to provide for the public safety by restraining dangerous practices or prohibiting dangerous structures."

In the same volume, on page 933, the police power of the State, with reference to railroads, is stated as follows:

"The police power of the State extends to the regulation and control of the entire business of railroads, so far as this is necessary to prevent injury to persons or property. Thus, railroad companies may be required to fence their right of way or tracks, and to erect and maintain cattle guards, and may be made liable for injury to passengers even in the absence of negligence. The police power also extends to regulating the speed of railway trains and locomotives, and the method of switching cars. The State may also require the use of air brakes.

"The legislative authority of the State under the police power also extends to all matters necessary to the safe crossing of a railroad track over a highway or another railroad track."

In Bluedorn v. Railroad, 108 Mo. 439, the court said on page 444: "It is well to bear in mind that laws and ordinances regulating the speed of railroad trains are police regulations purely. [Grube v. Railroad, 98 Mo. 330; Knobloch v. Railroad, 31 Minn. 402; Railroad v. Deacon, 63 Ill. 91; Thorpe v. Railroad, 27 Vt. 140.] As said in the case last cited: 'This police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State.'"

In People v. Railway Co., 79 Mich. 471, 474, the court said: "The following propositions can be regarded as well settled: (1) The police power of the State over railroads includes all those regulations which are necessary for the safety and protection of persons and property in transit over them, or crossing

them upon the public highways. The State may therefore require the use of air-brakes, the erection of fences and cattle guards, the stopping of trains at the crossings of other railroads, the use of bells and whistles, and many other things which will readily suggest themselves. This principle is commended by good sense, and is too well established to require the citation of authorities.''

The case of the City of St. Louis v. Meyer, 185 Mo. 583, is directly in point, that is, as far as principle is concerned. The defendant, a farmer, was arrested for not having a license under the ordinance of the city of St. Louis regarding peddlers. The State statutes define who shall be considered peddlers, but the ordinance of the city had a different definition. The defendant did not come within the definition of the statute, but did fall within the definition of the ordinance. That statute was not only applied within the territorial limits of the city of St. Louis, but the court also declared that the charter and ordinance of the city must always be in harmony with the Constitution and laws of the State. Among other things it was held as follows (syllabus):

''1. The charter of a city must always be in harmony with and subject to the Constitution and laws of the State.

''2. The city of St. Louis has no power under its charter to assess, levy or collect taxes or licenses inconsistent with the laws and Constitution of the State.

''3. If a farmer who sells the products of his farm along the streets of a city is not a peddler within the meaning of the statute, the city cannot by ordinance make him one. . . .

''6. The fact that the statute relieving farmers selling their eggs, butter, milk and other agricultural products from the duty of obtaining a peddler's license was passed after the adoption of the charter of St.

265Mo.32

Louis, does not make unavailing that statute as a defense when a farmer is prosecuted for making sales of such things without a license. The Constitution commits to local self-government matters of purely municipal or local concern, and as to matters of that kind the charter can be amended only by the people. But if the matter embraced within a statute is one in which the people of the entire State have an interest or is a subject to which general legislation may be directed, the fact that it amends the charter of the city does not make its provisions unavailing to any one affected thereby."

Continuing on page 591, the court said:

"First. It is insisted that sections 2098 and 2099 of the ordinance of the city of St. Louis, upon which this prosecution is based, are invalid or at least inapplicable to this defendant, because they are not in harmony with the Constitution and general laws of this State.

"Second. Because said ordinances are inconsistent with and in conflict with section 6146, Revised Statutes 1899.

"At the very threshold of the consideration of the propositions involved in this controversy, it is well to note the conceded and well-settled principles of municipal government, which is the basis or foundation upon which the argument of learned counsel for appellant, as well as respondent, is predicated. The mandate of the organic law of the State is, that the charter and amendment of municipal corporations shall always be in harmony with and subject to the Constitution and laws of the State. [Sec. 23, art. 9, Constitution.] . . .

"As emphasizing the constitutional limitations and restrictions upon the powers of municipal governments, the lawmaking power of the State has spoken in no doubtful or uncertain terms. It is provided, that, 'Any municipal corporation in this State, whether under general or special charter, and having authority to

pass ordinances regulating subjects, matters and things upon which there is a general law of the State, unless otherwise prescribed or authorized by some special provision of its charter, shall confine and restrict its jurisdiction and the passage of its ordinances to and in conformity with the State law upon the same subject.' "

After discussing the agreed statement of facts, the court said, beginning on page 593:

"The first proposition to be settled in this dispute is this: 'Has the State, by a general enactment of the Legislature, manifested a policy upon the character of business in which defendant was engaged?' If so, the city of St. Louis is restricted to the exercise of only such jurisdiction as is consistent with and in harmony with the policy of the State so manifested."

After setting out the State statute, the court continued as follows:

"The power of a municipal corporation to enforce an ordinance which includes a class of persons embraced within the exception of the statutes, was in judgment before the Kansas City Court of Appeals in Moberly v. Hoover, 93 Mo. App. 663. The statement in that case charges the defendant with peddling books in the city, without first having obtained a license. It was ruled that a person who goes about from place to place to sell books is not embraced within the signification of the term peddler as defined by section 8861, Revised Statutes 1899. Proceeding to the disposition of the question presented, SMITH, J., speaking for the court said:

" 'A construction of said ordinance which would make a peddler of one going about from place to place, within the territorial limits of the plaintiff, offering for sale books, would render it out of harmony with the provisions of the statute on the same subject from which we have quoted. The rule is, that when it can be seen that the exercise of any jurisdiction by a municipal corporation cannot be brought within the scope

of the grant of its powers without a conflict with the laws of the State the exercises of such jurisdiction cannot be allowed. [Kansas City v. Neal, 49 Mo. App. 72; St. Louis v. Bentz, 11 Mo. 61; St. Louis v. Schoenbusch, 95 Mo. 618].

" 'As was said by us in Kansas City v. Hallett, 59 Mo. App. 160: "The by-laws of a municipal corporation in order to be of any validity must be consistent with its charter and the general statutes of the State creating it. This is the well-understood principle of the common law. Such by-laws must not be repugnant to the legislative policy of the State so manifested by its general enactments." ' . . . .

"To the same effect is Town of Trenton v. Clayton, 50 Mo. App. 535. . . . It is, however, earnestly urged by learned counsel for respondent that the terms of the statute should be limited to a manifestation of its policy as to subjects of taxation for State purposes only, for the reason that chapter 140, of which section 8861 forms a part, nowhere evinces an intention to define who are or who are not peddlers for the purpose of prohibiting municipalities from exacting a license from such persons, and that no prohibitory terms are used in the statute against municipalities exacting a peddler's license from the class of persons embraced within the exception to the statute. It is apparent that the same reasons may be applied and can be urged as to persons who are within the exception, who go from place to place peddling books, and doubtless were presented in Moberly v. Hoover, supra. The contention was fully answered in that case, and we see no reason to depart from it.

"Following the rule as announced by the Kansas City Court of Appeals in the cases herein cited (and they are not in conflict with any ruling of this court, nor have the principles announced in any way been criticised) the defendant, in conducting the business as indicated by the agreed statement of facts, was not a

peddler within the terms of the statute, and the city of St. Louis, by ordinance or otherwise, was not authorized to make him one. Chapter 140, Revised Statutes 1899, in which section 8861 is embraced, is a general law, treating of the subject of peddlers and the method of licensing them to transact their business. This general law is applicable to every citizen of the State, and its force and vitality cannot be limited by municipal authority.''

Discussing the contention of counsel that the statute was an amendment of the charter of St. Louis, the court said, beginning on page 597:

''It is insisted by counsel for respondent that the exceptions contained in section 8861, which embraces the class in which defendant must be placed, can be of no avail to appellant, for the reason that the exception, as applicable to him, was not enacted until long after the adoption of the charter of the city of St. Louis; and it is argued that to apply the exception to him would in effect be amending the charter, which can only be done by a vote of the people. In support of this contention we are cited to the case of St. Louis v. Dorr, 145 Mo. 466. An analysis of that case will demonstrate its want of application to the question involved in the case at bar. 'Matters of purely municipal and local concern the Constitution intended to commit to local self-government,' and the boulevard act, involved in that case, was a subject of strictly municipal concern. That is not this case; the regulation and licensing of peddlers and hawkers is not a subject which can be limited to one of strictly municipal concern. It is one in which the people of the entire State have an interest, and is a subject to which general legislation may be directed, and when the State speaks upon the subject by a general enactment, its force and vitality are not limited to any particular locality. This much was conceded by the learned judge in the Dorr case. He said:

" 'In respect of those topics which involve the relations of the city to the State, there can be no doubt that the legislative power of the State may be properly exercised over the city of St. Louis, as has been done in many instances disclosed by decisions in the Missouri Reports. . . . The General Assembly has, furthermore, undoubted power to legislate for St. Louis, as for all other cities, in the full exercise of the police power of the State, as well as to enforce direct mandates of the fundamental law by appropriate statutes, and to pass all proper laws that are general throughout the State. State ex rel. Ziegenhein v. Railroad, 117 Mo. 1, affords an illustration of legislation of the latter sort. In that case a law intended to prescribe rules for assessing railroad property throughout the State was held applicable to St. Louis and operative to repeal charter provisions on that subject.' "

The enactments involved in the last case spring from the same source of power in the State as section 3303, now involved—the police power of the State, and there is no difference in the character of legislation. This is clearly shown by the following quotation from 15 Am. & Eng. Ency. Law (2 Ed.), 295: "The business of hawking and peddling is generally the subject of police regulation, and when license fees are imposed upon its pursuit, the exaction of such fees is usually an exercise of police power."

Section 16, article 9, of the Constitution, relative to formation of the charters of cities like Kansas City, among other things, provides: "Any city having a population of more than one hundred thousand inhabitants may frame a charter for its own government, consistent with and subject to the Constitution and laws of this State."

The first section of the Enabling Act contains the identical language of the Constitution above quoted.

Subdivision 31 of section 1, article 3, of the charter of Kansas City, recognizes the same by providing

that the city, through its legislative department, shall
have power ''to pass, publish, amend and repeal all
such ordinances, rules and police regulations not incon-
sistent with the provisions of this charter or the laws
of the State,'' etc.

In Moberly v. Hoover, 93 Mo. App. 663, in a case
involving an ordinance of the city of Moberly in con-
flict with the laws of the State, that court announced
the same rule approved in the Meyer case, supra, in
which this court held the same rule made applicable to
a city of the size of Moberly was also applicable to
St. Louis. The court held as follows (syl. 2):

''The charter and ordinances of a municipal corpo-
ration must be construed in harmony with the laws and
general legislative policy of the State, and ordinances
taxing peddlers will be construed to harmonize with
the general laws governing peddlers.''

And as well said by counsel for the defendant:
''The statute is one which has been enacted by the
State for the protection of the citizens of the State and
the traveling public and the users of highways where-
ever a street railroad intersects a steam railroad. It is
applicable to, and in force over, every inch of territory
in the State of Missouri, whether in the country or in
the city, and whether in the obscure and small hamlets
of the State or in the great cities like Kansas City and
St. Louis. The contention of counsel that such a stat-
ute interfered with the exclusive control of the streets
granted Kansas City is of no force whatever. It will
be observed that the ordinances in both the Hoover
and Meyer cases were such that the contention could
have well been made that to have applied the State
law would be an interference with the control the cit-
ies in question had over their streets. The very object
of the ordinance was to compel a peddler going from
house to house along the streets of the cities to pay a
license, contrary to the general law of the State. If
the statute in question would be an interference with

the control of the cities over their streets, all that involved in the cases which we have just noted would even more seriously interfere and conflict with that control. There was not, however, the slightest semblance of an attempt by the State in this statute to exercise any control over the streets or to interfere therewith. It was simply a police regulation seeking to minimize the dangers of the crossings involved, whether the point of intersection is a street or elsewhere, and it is idle to contend that such a statute could in any way interfere with the control the city has over its streets. If the State were attempting to say in the statute that a street or steam railroad should have certain rights to place and maintain tracks in its streets, then there might be something in the contention, but where the legislation relates solely to the conduct of the cars and trains which are apt to meet at such point of intersection, it is absurd to even suggest that such a legislation is an attempt to take from the city the control of its streets.''

In the recent case of State ex rel. v. Police Commissioners, 184 Mo. 109, there was involved certain charter provisions of Kansas City and certain State laws regarding the police force of Kansas City. The charter conflicted with the provisions of the statutes. It was contended in this case, that the provisions of the charter should control. But this court In Banc denied this contention, holding among other things, as follows (syllabus):

''2.   The constitutional provision authorizing certain cities to adopt charters for their own government, expressly limits the power to a requirement that the charter so adopted must be 'consistent with and subject to the Constitution and laws of this State.'

''3.   A special charter of a city organized under section 16 of article 9 of the Constitution, does not in so far as it undertakes to control the employment and

discharge of policemen repeal or supersede an existent general State law relating to the same subject."

After setting out the provisions of the State statutes and the charter, the court said, beginning on page 132:

"This narrows the case to this: Under the charter the relator was wrongfully discharged, but under the State law, his discharge was legal. Which law governs? The Kansas City Court of Appeals, in an able and elaborate opinion by ELLISON, J. (80 Mo. App. 206), held that the State.law controlled, and that the discharge was legal, and that conclusion was right."

After holding that the provisions of the State statutes were upon a subject-matter of general importance to the State, the court said, beginning on page 133:

"Hence, the Act of 1874, related to a matter which primarily belonged to the State, in which every citizen of the State had an interest, and which was, therefore, not simply a matter of local concern. This being true, no decision that has so far been rendered gives any color or countenance to the power of the city to repeal such a State law by adopting a special charter under section 16 of article 9 of the Constitution, which contains inconsistent or variant provisions touching the same subject.

"In fact, that section of the Constitution expressly provides that the city may adopt a charter for its own government, but it limits this by requiring that the charter so adopted must be 'consistent with and subject to the Constitution and laws of this State.'"

The court, after noting certain prior decisions, concludes as follows, on page 134:

"It follows without more discussion or elaboration that article 11 of the charter of Kansas City, adopted in 1889, did not have the effect of superseding or repealing the Act of 1874, and that so long as that act remains in force, it is beyond the power of Kansas City to repeal it or to create a board of police com-

missioners, or a police force of its own. It also follows that the defendants hold their offices by virtue of the Act of 1874, and the amendments thereto and not by force of the city charter, and that the same is true of the relator.''

In State ex rel. v. Mason, 153 Mo. 23, this court In Banc had under consideration an Act of 1899, providing for the creation and organization in all cities having 300,000 inhabitants and over, of a board of police commissioners, etc. The enforcement of this act in the city of St. Louis was resisted upon the ground, as it was claimed, that it was under a special charter and therefore the act did not apply. The court held that the act was valid as being an exercise of the general legislative power of the State, and was applicable to the city of St. Louis.

In State ex rel. v. Railroad, 117 Mo. 1, it was contended that the statute providing for the levy of taxes against railroad companies was in conflict with the provisions of the city charter of the city of St. Louis, upon the same subject. The question presented was as to which method should be followed, and this court held that the provision by the general statutes of the State was the proper procedure. It was held as follows:

''The Legislature can change or amend the charter of the city of St. Louis.'' [Syl. 2.]

The court said, beginning on page 11:

''Enough has been said to show that there is a direct conflict between the charter of the city of St. Louis and the general law, so far as they relate to the method of extending the taxes levied upon railroad property and the subsequent proceedings for collecting the same. We are, then, brought to inquire which procedure is to be followed. The Legislature had and has the power to alter and amend the charter of the City of St. Louis, . . . It is, therefore, perfectly clear that taxes on railroad property must be extended and collected in

the city of St. Louis in the manner pointed out in arti-
cle 8 of chapter 145 of the general revenue law, Re-
vised Statutes 1879.

In Ewing v. Hoblitzelle, 85 Mo. 64, syl. 6, it was
said:

"Said act of March 31, 1883 (Laws 1883, p. 38),
is not invalid as being in conflict with the provisions
of the Constitution authorizing the voters of the city
of St. Louis to frame and adopt a charter for its gov-
ernment, such charter and amendments thereto being
by express provision of the Constitution subordinate
to the Constitution and laws of the State."

In Kansas City v. Hallett, 59 Mo. App. 160, syl. 1,
it is held as follows:

"It is a well understood principle of the common
law that the ordinances of a municipal corporation to
be of any validity, must be consistent with its charter
and the general statutes of the commonwealth creat-
ing it, and must not be repugnant to the legislative pol-
icy of the State."

We have at some length reviewed the leading cases
of this State upon this question, and the doctrine an-
nounced in all of them is to the effect that the State
still retains its general police power over the entire
State, including Kansas City and St. Louis, notwith-
standing the constitutional delegation of authority up-
on them to adopt special charters for their self-gov-
ernment.

The Legislature still retains authority to enact
general statutes for the protection of all the citizens
of the State and the traveling public in general; and
when we view the object and purpose of this statute
there remains no room to doubt its application to the
entire State, including all cities, towns and villages of
every class and character. This is made plain by the
very constitutional provision which authorizes cities
containing a population of one hundred thousand or

more to frame charters for their own government, which must be *consistent with and subject to the Constitution and laws of the State.* If Kansas City has the *exclusive* power to regulate the streets and highways of that city, or more accurately speaking, to prescribe the manner of intersection and the mode of street cars crossing the tracks of steam railroads, then that power of the city would *be neither consistent with nor subject* to the statute in question, which provides for the manner of street cars crossing the tracks of steam railroads; but, upon the contrary, its charter would be *exclusive of* and *independent* of that statute. Without the last proviso of said constitutional provision, such a charter would clearly give the city exclusive and independent control over its streets and highways and over the others matters under discussion, but with it added, the framers of the Constitution in their wisdom saw proper thereby to provide that the charter should be consistent with and subject to the laws of the State. So finding the law thus written, we have nothing to do but to declare that the statute in question is applicable to Kansas City, as well as all other portions of the State.

Notwithstanding the fact that we hold this statute to be in force in Kansas City, yet we are unable to lend our concurrence to the insistence of counsel for the defendant to the effect that said sections 9752 and 9753 are unconstitutional and void; but are of the opinion, and so hold, that said section 3303 is supplementary to and in aid of the former, designed to add greater security to the safety of the traveling public at large than Kansas City and probably other cities of the State have provided, and which in their wisdom may deem unnecessary.

IV. Having reached the conclusions as stated in Paragraph Three of the opinion, viz: that section 3303,

Statute
as Defense:
Proximate
Cause of
Injury.

Revised Statutes 1909, does apply to Kansas City and that it is not in conflict with sections 9752 and 9753, Revised Statutes 1909, but is supplementary to and in aid of them, then how stands the case?

Counsel for defendant insist that plaintiff is not entitled to a recovery because neither he nor any other employee of the street railway company stopped the car he was operating at a point between ten and twenty feet south of the south track of the railroad company located in First Street, nor did he or any other employee proceed forward to the tracks of said railroad company for the purpose of ascertaining whether a train was approaching said crossing, as required by said section 3303.

It must be conceded that said statute is mandatory and if it applies to the motorman, which is questionable, and its violation caused or contributed to the injury, then clearly under the authorities the plaintiff would not be entitled to a recovery.

But that axiomatic proposition does not necessarily debar a recovery in this case, because it was not conclusively shown that its violation caused the injury complained of or contributed thereto; but upon the contrary there was much testimony introduced tending strongly to show that its violation did not cause or contribute to the injury.

Briefly stated, without going again into the evidence upon this point, it tended to show that the plaintiff stopped the car south of the south track of defendant's crossing, as required by the statute, and there remained until he received a signal from the flagman, an employee of the defendant, indicating that the crossing was clear and for him to proceed over the crossing; that in obedience to that signal the plaintiff started the car and had passed over some five or six of the railroad tracks, a distance of sixty feet or more, from which point he first discovered the car of the defend-

ant, the one which collided with the street car he was operating, and which injured him, coming from behind a string of box cars standing near the other side of the street, completely obstructing its view, until his car came within a few feet of it; the former moving from ten to fifteen miles per hour and the latter from five to six; and that the collision occurred in a very few seconds, some of the witnesses said within six or eight seconds.

If those facts were true, and they were matters for the jury to pass upon, then clearly the violation of the statute had nothing whatever to do with the plaintiff's injury, for the reason that had the conductor or some other employee of the street car company proceeded to the tracks of the defendant for the purpose of looking for an approaching train he clearly could not have seen from that point, a distance of about one hundred and fifty feet south of the point where the car of the defendant which caused the injury was approaching the crossing behind the string of freight cars, and which did not emerge therefrom until the plaintiff reached a point but a few feet from said standing cars. In other words, had the conductor proceeded to the point required by the statute he could not have seen the defendant's car from that point nearly so well as the employees could have seen it from the point where the street car was when the plaintiff first saw it emerging from behind the standing cars on the west side of the street.

From this it is perfectly apparent that the failure of the conductor to go to the tracks of the defendant and look for trains, had no causal relation with the injury complained of. Had he alighted from the street car and walked to the defendant's tracks, as the statute required, he would not and could not have seen the car of the defendant, which caused the injury, until the street car would have reached the point where the

plaintiff first saw it, which was too late to avoid the collision, as the jury found the fact to be.

V.   Counsel for defendant have lodged objections to the instructions given and refused by the court; but **Instructions.**    it is not necessary to pay particular attention to them, for the reason that they presented the law substantially to the jury, as indicated by the conclusions before announced.

Finding no substantial error in the record, the judgment of the circuit court is affirmed.

All concur; *Bond, J.*, in result.